2308

Norman D. ACKERMAN, Jr. and Jo Ann Ackerman, Respondents v. The TRAVELERS INDEMNITY COMPANY, Appellant.

(456 S.E. (2d) 408)

Court of Appeals

*M. Dawes Cooke, Jr.* and *Thomas B. Pritchard* both of *Barnwell, Whaley, Patterson & Helms,* Charleston, *for appellant.*

*Stephen Bucher of Bucher & Associates,* Charleston, *for respondents.*

Heard Jan. 12, 1995.

Decided Feb. 27, 1995.

*Per Curiam:*

Respondents, Norman D. Ackerman, Jr. and Jo Ann Ackerman (Ackermans), brought this suit for declaratory judgment and reformation of an automobile insurance policy against appellant, Travelers Indemnity Company (Travelers). The Ackermans asked the court to reform the policy to include underinsured motorist coverage up to the liability limits of the policy as a remedy for Travelers' alleged failure to comply with S.C. Code of Laws § 38-77-160 (1976 as amended). This statute requires automobile insurance carriers to offer their insureds optional underinsured motorist coverage up to the limits of liability coverage. *See State Farm Mut. Auto. Ins. Co. v. Wanamaker,* 291 S.E. 518, 354 S.E. (2d) 555 (1987). The trial court held the policy mut be reformed to provide underinsured motorist coverage for the benefit of the Ackermans, and the amount of coverage provided should extend to the full $500,000 liability limits. Travelers appeals. We affirm.

The case arises out of an accident in which Mr. Ackerman was seriously injured on December 23, 1989 when he was struck by a car driven by Jarutha Scott (Scott). The insurance carrier for Scott paid the Ackermans its liability limit of $15,000 in consideration of a Covenant Not to Execute.[1]

---

[1] The Ackermans sued Scott in tort for damages relating to Mr. Ackerman's bodily injury and Mrs. Ackerman's loss of consortium. The Ackermans ac-

The truck Mr. Ackerman was occupying when the accident occurred was owned by his employer, Stuart's Exxon & Towing (Exxon). This truck was insured under a garage liability insurance policy issued by Travelers. The Travelers' policy provided liability coverage in single limits of $500,000 per occurrence, and combined uninsured and underinsured motorist coverage of $35,000 single limits.

Mr. Ackerman's medical injuries alone were in excess of the coverage afforded under Scott's policy. Therefore, after exhausting the limits of Scott's policy, the Ackermans claimed against Travelers for underinsured motorists benefits. They demanded underinsured benefits in excess of the $35,000 provided in the declaration of the Policy, contending Travelers failed to make Exxon a meaningful offer of underinsured motorist coverage as required by law. Because of this failure, Ackerman contends, the available underinsured motorist benefits must be the $500,000 single limits of liability. Travelers denied the $500,000 claim and, instead, determined the maximum underinsured motorist coverage available to the Ackermans should be $35,000 as provided by the policy. It is from this denial of underinsured motorist coverage or, in the alternative, limitation of the coverage to $35,000 that the declaratory judgment action arose.

At trial, Travelers denied liability and asserted several defenses: (1) because Traveler's policy was a replacement policy issued during the transitional period in 1989 before a new statutorily mandated offer form was implemented, no offer of underinsured motorist coverage was required; (2) if such an offer was required, an adequate offer was made and rejected; (3) the Ackermans are not insured under the underinsured motorist coverage, regardless of the amount of coverage available, because Mr. Ackerman was not "occupying" an insured vehicle at the time of the accident, but was instead walking next to it,[2] and (4) the Covenant Not to Execute given by the Ackermans to Scott precluded recovery of underinsured motorist benefits.

---

cepted the tender of liability limits from Scott, executed and delivered the Covenant Not to Execute and obtained a stay of their tort action against Scott pending resolution of this case.

[2] At oral argument, Travelers abandoned this defense by conceding that Mr. Ackerman was an insured as defined by the policy language.

The trial court rejected Travelers' arguments, and, instead determined that Travelers was required to make an effective offer of underinsured motorist coverage to Exxon under S.C. Code Ann. § 38-77-160 (1987), and failed to do so. The court further concluded the Ackermans were insureds under the policy and that the Covenant Not to Execute did not bar them from pursuing their claims of underinsured motorist coverage.

## I.

On appeal, Travelers first argues it was not required to offer Exxon underinsured motorist coverage up to the liability limits because Exxon replaced an existing policy with the Travelers policy and pursuant to S.C. Code Ann. § 38-77-350(C) (1989) no offer of underinsured motorist coverage was required. The statute relied upon by Travelers reads:

> An automobile insurer is not required to make a new offer of coverage on any automobile insurance policy which renews, extends, changes, supercedes, or replaces an existing policy. However, the first renewal notices for existing policies after December 1, 1989, must include the form provided in subsection (A).[3]

The general statute setting forth the duty of an insurer to offer underinsured motorist coverage, S.C. Code Ann. § 38-77-160 (1987), mandates that insurers "shall . . . offer, at the option of the insured, underinsured motorist coverage up to the limits of the insured liability coverage. . . ." Travelers maintains that § 38-77-350)C) suspended the general statute as relates to replacement policies issued between July 1, 1989 and December 1, 1989.[4]

---

[3] The Automobile Insurance Reform Act of 1989 became effective July 1, 1989. It required that insurance companies offer optional coverages and prescribed a form to be used. Insurance companies were to begin using the form by December 1, 1989. Section 38-77-350(C) stated the necessary procedures for the window between July 1 and December 1, 1989. In this case, the "offer" was made approximately one month to six weeks prior to the August 28, 1989 effective date of the policy.

[4] Specifically, Travelers maintains that, after July 1, 1989, insurers were not required to offer underinsured motorist coverage on renewal or replacement policies until December 1, 1989, when they were required to use the new prescribed form. The General Assembly gave insurers a grace period in anticipation of the implementation of the mandated form. Since the policy in this case was issued on August 28, 1989, Travelers contends it fell within the grace period, and no offer was required.

The Ackermans, on the other hand, contend § 38-77-350(C) does not apply in the instance where, as here, the insured has changed insurers. They reason that Travelers' policy was not a replacement policy within the contemplation of the statute because Travelers had not previously made an offer of underinsured motorists coverage to Exxon and the statute only relieves the insurer of the duty to make a "new" offer to insureds with whom they have dealt before. We agree with the Ackermans.

Exxon was not an existing insured of Travelers. Travelers wrote a garage liability policy for Exxon effective August 28, 1989 to replace two policies issued by Canal Insurance Company and American Mutual Insurance Company.[5] Although Canal obtained a written waiver of underinsured coverage from Exxon in 1988, no written waiver was acquired by Travelers when it issued the replacement policy.

We believe where § 38-77-350(C) states that the insurer is not required to make a "new" offer, it clearly envisions the circumstance where the insurer already made an "old" offer. In construing and interpreting this statute, our primary consideration is finding the intent of the legislature. *See Garris v. Cincinnati Ins. Co.*, 280 S.C. 149, 311 S.E. (2d) 723 (1984). Where two statutes are in apparent conflict, they should be construed, if reasonably possible, as to allow both to stand and to give force and effect to each. *Stone & Clamp General Contractors v. Holmes*, 217 S.C. 203, 60 S.E. (2d) 231 (1950). If § 38-77-350(C) were interpreted to relieve Travelers of the general requirement of offering Exxon underinsured motorist coverage up to the liability limits of the policy, it would amount to an absolute repeal of § 38-77-160, which mandates that an automobile insurer offer underinsured motorist coverage up to the limits of the insureds' liability coverage. Thus, the only reasonable way to interpret the language in § 38-77-350(C) is to recognize that the insurer may rely on the effective past offers it has given to its insureds when these insureds continue coverage with the same insurer. Had the General Assembly meant to require no offer in the interim period, it would have said "no" offer rather than

---

[5] The parties stipulate that Travelers' policy was issued to "replace" policies which Exxon formerly had with American Mutual and Canal.

no "new" offer. *See C.A.N. Enter. v. S.C. Health and Human Serv. Fin. Comm'n*, 296 S.C. 373, 373 S.E. (2d) 584 (1988) (where one construction makes a provision unusual or extraordinary and another construction which is equally consistent with the language employed, would make it reasonable, fair, and just, the latter construction must prevail).

Hence, we concur in the trial court's determination that the Legislature intended to exempt insurance companies who replaced existing policies before December 1, 1989, from making offers of underinsured motorist coverage to their already existing insureds. Exxon was a new insured whom Travelers had never dealt with before and consequently this exemption was inapplicable. Therefore, we affirm the trial court's conclusion that Travelers was bound pursuant to S.C. Code Ann. § 38-77-160 (1987 & Supp. 1993) to offer underinsured motorist coverage up to the limits of Exxon's liability coverage.

## II.

Travelers' next argues that even if it was required to make an effective offer, the evidence shows that its agent, Mr. Webb, made an adequate offer which was rejected. We disagree.

The leading case establishing the standards for making an effective offer, *State Farm Mut. Auto. Ins. Co. v. Wannamaker*, 291 S.C. 518, 354 S.E. (2d) 555 (1987), created a four-prong test which must be met by the insurer to establish it complied with its duty to offer the optional underinsured motorist coverage:

> (1) the insurer's notification process must be commercially reasonable, whether oral or in writing; (2) the insurer must specify the limits of optional coverage and not merely offer additional coverage in general terms; (3) the insurer must intelligibly advise the insured of the nature of the optional coverage; and (4) the insured must be told that optional coverages are available for an additional premium.

*Wannamaker*, 291 S.C. at 521, 354 S.E. (2d) at 556 (adopted test formulated by the Minnesota Supreme Court in *Hastings v. United Pac. Ins. Co.*, 318 N.W. (2d) 849 (Minn. 1982)). The initial burden of proving that a meaningful offer of optional

coverage had been made to the insured is placed on the insurer. *Jackson v. State Farm Mut. Auto. Ins. Co.*, 301 S.C. 440, 392 S.E. (2d) 472 (Ct. App. 1990), *aff'd as modified*, 303 S.C. 321, 400 S.E. (2d) 492 (1991). The insurer must satisfy all four prongs of the *Wannamaker* test to prove there was an effective offer of underinsured motorist coverage, and failure of any one of these prongs vitiates the offer and requires reformation of the policy to include underinsured motorist coverage to the limits of liability. *Dewart v. State Farm Mut. Auto. Ins. Co.*, 296 S.C. 150, 370 S.E. (2d) 915 (Ct. App. 1988).

The facts material to whether Travelers made an effective offer of underinsurance are not in dispute. Two people were involved in Travelers' purported offer of underinsured motorist coverage to Exxon, Ray Stuart, Jr., Exxon's president, and Donald Webb, an independent agent for Travelers. Webb discussed the policy with Stuart at the Exxon service station. Their discussion was oral and there was no written explanation or offer.

Although our broad scope of review allows this court to find the facts in accordance with our own view of the evidence, we are not required to disregard the findings of the trial judge who saw and heard the witnesses, and was in a better position to evaluate their credibility. *Cherry v. Thomasson*, 276 S.C. 524, 280 S.E. (2d) 541 (1981). We agree with the trial court that Travelers failed to make an effective offer of underinsurance to Exxon.

Webb testified he offered Stuart "higher limits," but did not specify the limits offered. To be effective, the insurer must specify the limits of optional coverage and not merely offer it in general terms. *See Hanover Ins. Co. v. Horace Mann Ins. Co.*, 301 S.C. 55, 389 S.E. (2d) 657 (1990). The offer of underinsured motorist coverage by Webb to Stuart was vague and general and not sufficiently specific. Nothing in evidence establishes that Travelers made an offer of coverage of "up to" the $500,000 limits. As such, the offer made was defective as a matter of law. *Jackson*, 303 S.C. 321, 400 S.E. (2d) 492; *Dewart*, 296 S.C. 150, 370 S.E. (2d) 915.

Webb also failed to provide Stuart with a separately stated premium amount for optional coverage at the specified limits. Webb testified he did not price the premium for underinsured motorist coverage at the liability limits and his own memoran-

dum says, "no price given." This omission is also fatal and renders the offer ineffective. *American Sec. Ins. Co. v. Howard,* 315 S.C. 47, 431 S.E. (2d) 604 (Ct. App. 1993).

The trial court also found Webb failed to intelligibly advise Exxon of the nature of the optional coverage.

Webb stated he "explained" underinsured motorist coverage by merely reading the description on the policy itself. To be effective, the offer must be explained in a format and language that allows the insured to make an informed decision to accept or reject the coverage. *Dewart,* 296 S.C. at 154, 370 S.E. (2d) at 917. The policy language alone is insufficient to apprise the insured as to what underinsured motorist coverage is. It contains no explanation of the nature of underinsured motorist coverage and no explanation as to what specifically would be covered for an insured injured by an underinsured motor vehicle. This omission also rendered the offer ineffective.

Travelers contends the deficiencies in the offer are not controlling or fatal in this "unique" case because there was no disagreement between the insurance company and the named insured as to what coverage the insured wanted to purchase, and it cannot force the coverage onto an unwilling buyer. Stuart stated unequivocally that he did not want additional underinsured coverage. Concerned only about the price of the premium, Stuart told Webb, "I don't want to purchase too much and I don't want to purchase not enough. I want to purchase exactly what will get me by with state law." Nevertheless, our Supreme Court has held even if the insured expressly rejects the optional coverage, a noncomplying offer has the legal effect of no offer at all. *Hanover,* 301 S.C. 55, 389 S.E. (2d) 657. Furthermore, a third party not privy to the contract may assert the lack of an adequate offer and reform the contract to increase the coverage. *See Howard,* 315 S.C. 47, 431 S.E. (2d) 604 (Insurance companies' failure to make a meaningful offer of underinsured motorist coverage entitled insured's husband to reformation of her policy even though insured had consistently rejected underinsured motorist coverage in the past, indicating she was only interested in purchasing mandatory liability coverage at the lowest premium cost and would have rejected the optional coverages even if the required information had been included in the offer.). Conse-

quently, we affirm the trial court's holding that Travelers failed to make an effective offer as required by the statute and *Wannamaker*, and the Ackermans are therefore entitled to reformation of Exxon's policy to include underinsured motorist coverage up to $500,000.

## III.

Finally, Travelers argues it is not liable for underinsured coverage because the Ackermans signed a Covenant Not to Execute against Ms. Scott which has the effect of precluding recovery of underinsured motorist benefits. Travelers' policy states:

> We will pay in accordance with the South Carolina Unisured Motorists Law all sums the insured is legally entitled to recover as damages from the owner or driver of an uninsured motor vehicle. . . .

Because the Ackermans agreed in the Covenant Not to Execute that they would not go against the personal assets of Scott in collecting on any judgment they might attain against her, Travelers argues this operates to release the liability insurer because it would no longer be "legally obligated to pay" damages. Under these circumstances, Travelers argues, there is no coverage under the liability policy which provides only for payment of such sums as an insured is "legally entitled to recover" from an underinsured motorist. We disagree.

"A Covenant Not To Execute is a promise not to enforce a right of action or execute a judgment when one had such right at the time of entering into the agreement." *Poston by Poston v. Barnes*, 294 S.C. 261, 363 S.E. (2d) 888 (1987). A Covenant Not to Sue and a Covenant Not to Execute are so closely akin that the only major distinguishing factor is that the latter is normally executed when a settlement occurs after the filing of a lawsuit while the former is entered into before a lawsuit is filed. *Id.* 363 S.E. (2d) at 890. The Covenant Not to Sue was developed at common law to allow the release of one or more joint tortfeasors without affecting the covenantor's rights against the other joint tortfeasors:

> At common law, a valid release of one joint tort-feasor was usually a release of all the joint wrongdoers and was a bar to a suit against any of them for the same wrong. At

the base of this rule was the theory that there could be but one compensation for the joint wrong. If the injured party was paid by one of the wrongdoers for the injury he had suffered, each wrongdoer being responsible for the whole damage, his cause of action was satisfied in exchange for a release, and he could not proceed against the others. Thus a release of one joint wrongdoer released all. But when the consideration received for the release was not full compensation for the injury, the purpose for the harsh rule did not exist. To allow for this, the covenant not to sue was developed. (Citations omitted.)

James W. Logan, Jr., *Insurance—Covenant Not to Sue*, 21 S.C.L. Rev. 282 (1969).

The intention of the parties governs in determining whether an instrument is a covenant not to execute or release. E.H. Schopler, Annot., *Release of One Joint Tortfeasor as Discharging Liability of Others; Modern Trends*, 73 A.L.R. (2d) 403 (1960). Because the language of the covenant in this case clearly contemplates that the Ackermans may recover any underinsured coverage available, but will not go against the personal assets of Scott, the trial court concluded that recovery of underinsured coverage is not precluded by the Covenant Not to Execute. We agree.

The Ackermans are still entitled to recover damages from Scott; they merely agreed not to legally enforce the judgment. In fact, the covenant expressly reserves the Ackermans' right to obtain a judgment against Scott, stating:

> Norman D. Ackerman, Jo Ann Ackerman, and Casualty Reciprocal Exchange do further covenant and promise that if they should attain a judgment against Jerutha Scott, they will not execute on said judgment against Jerutha Scott
>
> &ast; &ast; &ast; &ast; &ast;
>
> [T]his instrument is not intended as a release or discharge, nor as an accord and satisfaction with any person whomsoever, but only as a Covenant Not to Execute against Jerutha Scott . . . and is executed simply to purchase freedom from the threat of execution upon any judgment that may be attained against Jerutha Scott, or Unison Insurance Company in any potential lawsuit.

Under these facts, we agree with the trial court that recovery of underinsured benefits is not precluded.

For reasons stated, we affirm.

Affirmed.

HOWELL, C.J., and CONNOR and CURETON, JJ., concur.