546 S.E.2d 665

**June P. ANDRADE, Appellant,**

**v.**

**Jimmy JOHNSON, Sea Island Air, Inc., and South Carolina Electric & Gas Co., Inc., Defendants,**

**of whom South Carolina Electric & Gas Co., Inc., is Respondent.**

**No. 3321.**

Court of Appeals of South Carolina.

Heard Sept. 12, 2000.

Decided March 19, 2001.

Rehearing Denied June 11, 2001.

J. Brent Kiker and Anne S. Douds, both of Kiker & Douds, of Beaufort, for appellant.

A. Parker Barnes, Jr., and David S. Black, both of A. Parker Barnes, Jr. & Associates, of Beaufort, for respondent.

STILWELL, Judge.

In this action alleging negligence, violation of the South Carolina Unfair and Deceptive Trade Practices Act (UTPA), fraud, and breach of contract, June Andrade appeals the trial court's order which: (1) dismissed her action against South Carolina Electric & Gas which was based on its vicarious or derivative liability due to the negligence of the installer; (2) held SCE&G exempt from the UTPA; and (3) directed a verdict against her on the negligence claims against SCE&G. We affirm in part and reverse in part.

## FACTS

In the fall of 1994, June Andrade decided to replace the existing heating, ventilation, and air conditioning (HVAC) system in her Beaufort townhouse and selected two installers from the phone book from which to request estimates. One of these installers was Sea Island Air, which attracted Andrade

with its advertisement proclaiming it to be an SCE&G Quality Dealer.

After Andrade contacted Sea Island, its president, Jimmy Johnson, visited her at home. Johnson emphasized his SCE&G Quality Dealer designation and described himself as "the biggest dealer in the area." Johnson extolled the virtues of the Quality Dealer program and SCE&G's financing program that was only available to purchasers who used a Quality Dealer as their installer.

While Johnson was preparing an estimate for the proposed work, Andrade went to an SCE&G office and obtained a brochure which explained the Great Appliance Trade–Up Program. The brochure explained that to qualify for a special rebate or credit toward the monthly bill, a customer must:

Be an electric customer of SCE&G on rates 1, 7, 8 or 9.

Purchase one of the high-efficiency units ... and have it installed by an SCE&G Quality Dealer. SCE&G-certified Quality Dealers are the only contractors whose installation work qualifies for rebates in our Great Appliance Trade–Up Program, as well as for special energy rates for the SCE&G Good Cents or Rate 7 homes. Call your local heating and air conditioning contractors to find out if they are certified Quality Dealers. Or call SCE&G for a list of participating dealers in your area.

Andrade testified the brochure "confirmed everything that Mr. Johnson had told me, that the only way that I could get into this program sponsored by SCE&G was to go through a Quality Dealer and he was a Quality Dealer."

Andrade agreed to have two new HVAC systems installed in her home and experienced difficulty almost immediately. She was initially disappointed when what she described as five or six teenage boys arrived on January 17, 1995 to install the new systems because Johnson had assured her he had a "highly professional team" working for him. These workers used both her bathroom and telephone without permission, played radios loudly and, according to Andrade, "it was just like a party atmosphere." After Andrade complained, an older, more professional crew arrived the following day.

The new crew worked for approximately two days, did not complete the installation, and disappeared. Andrade continued to complain to Johnson and SCE&G, but received little if any satisfaction or response to her entreaties from either.

Finally, a crew returned, worked sporadically for a week, and concluded their work on February 28, 1995. Andrade immediately observed difficulties with the operation of the system and informed Johnson of the deficiencies. However, she did sign the financing forms authorizing SCE&G to pay Sea Island for the work. She testified she signed the forms even though the systems were not operating properly because Johnson was "very intimidating."

Andrade was forced to buy electric heaters to warm her house for the balance of the winter. At Andrade's request, the Beaufort codes department inspected the installation and listed approximately fifteen code violations committed by Sea Island. Andrade also arranged to have the head of the local SCE&G Quality Dealer program inspect the installation. When this proved unproductive, Andrade saw the general manager of SCE&G's Beaufort office and asked him to intervene with Johnson and Sea Island to remedy the problems. When all else failed, Andrade was forced to hire another contractor to remove and replace the systems installed by Sea Island, and to file this suit.

Prior to trial, Andrade settled with Johnson and executed a covenant not to sue in his favor. The covenant expressly reserved any and all claims Andrade had against SCE&G. The court granted summary judgment to SCE&G on Andrade's UTPA claim and on her claims based on SCE&G's vicarious or derivative liability. The court directed a verdict in SCE&G's favor on Andrade's remaining causes of action alleging independent negligence and misrepresentation.

## LAW/ANALYSIS

### I. Effect of Covenant Not to Sue

Andrade first argues the court erred in finding the covenant not to sue released both Jimmy Johnson and SCE&G, therefore granting summary judgment to SCE&G. We disagree.

Summary judgment is appropriate when it is clear there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), SCRCP; *see Vermeer Carolina's, Inc. v. Wood/Chuck Chipper Corp.*, 336 S.C. 53, 59, 518 S.E.2d 301, 304 (Ct.App.1999). In determining whether any triable issue of fact exists such as to preclude summary judgment, the evidence and all inferences reasonably drawn therefrom must be viewed in the light most favorable to the non-moving party. *Strother v. Lexington County Recreation Comm'n*, 332 S.C. 54, 61, 504 S.E.2d 117, 121 (1998).

In the covenant Andrade agreed to "never institute any action or suit at law or in equity against covenantee, nor . . . in any way aid in the institution or prosecution of any claim . . . for damages . . . or compensation . . . arising out of the installation of two Rheem Air Conditioner systems in [Andrade's] home . . ."

However, in the same document Andrade also reserved "all rights of action, claims, and demands against any and all persons other than [Johnson], including but not limited to South Carolina Electric & Gas Co., Inc. and/or SCANA Corp."

A covenant not to sue is an agreement not to sue to enforce a right existing at the time of the making of the agreement. *See Wade v. Berkeley County*, 339 S.C. 513, 520, 529 S.E.2d 743, 747 (Ct.App.2000). A covenant not to sue is not a release. *Id.* The common law rule governing releases until relatively recently was that the release of one tortfeasor automatically released all joint tortfeasors. The rule, and the reason for the advent of a covenant not to sue, has been explained as follows:

> At the base of this rule was the theory that there could be but one compensation for the joint wrong. If the injured party was paid by one of the wrongdoers for the injury he had suffered, each wrongdoer being responsible for the whole damage, his cause of action was satisfied in exchange for a release, and he could not proceed against the others. Thus a release of one joint wrongdoer released all. But when the consideration received for the release was not full compensation for the injury, the purpose for the harsh rule

did not exist. To allow for this, the covenant not to sue was developed.

*Ackerman v. Travelers Indem. Co.*, 318 S.C. 137, 146–47, 456 S.E.2d 408, 413 (Ct.App.1995) (quoting James W. Logan, Jr., *Insurance—Covenant Not to Sue*, 21 S.C. L.Rev. 282 (1969)).

Our supreme court in *Bartholomew v. McCartha* changed the common law rule. 255 S.C. 489, 491–92, 179 S.E.2d 912, 913–14 (1971). The court held unless it was the intention of the parties, or the plaintiff had received full compensation amounting to a satisfaction, the release of one tortfeasor did *not* release others who wrongfully contributed to the plaintiff's injuries. *Id.* at 492, 179 S.E.2d at 914.

This principle was codified in the South Carolina Contribution Among Tortfeasors Act (UCATA).[1]

■ Andrade argues this provision prohibits the release of SCE&G and urges this court to expand the definition of tortfeasor under the UCATA to include vicariously liable parties. We decline to do so.

Other jurisdictions are divided as to whether a covenant not to sue a primarily liable party while reserving rights against a secondarily liable party preserves causes of action against the latter. *See generally* Vitauts M. Gulbis, Annotation, *Release of, or Covenant Not to Sue, One Primarily Liable for Tort, But Expressly Reserving Rights Against One Secondarily Liable, as Bar to Recovery Against Latter.* 24 A.L.R.4th 547, 552 (1983).

Courts that hold a covenant not to sue a primarily liable party discharges the secondarily liable party have generally

---

1. S.C.Code Ann. §§ 15–38–10 to –70 (Supp.2000). Section 15–38–50 provides:

When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

(1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and

(2) it discharges the tortfeasor to whom it is given from all liability for *contribution* to any other tortfeasor.

S.C.Code Ann. § 15–38–50 (emphasis added).

fallen into one of the following categories: (1) courts that find the agreement discharges the primary liability and thus extinguishes the secondary liability;[2] (2) courts that find the secondarily liable party's right to indemnification renders the covenant illusory;[3] and (3) courts that hold the secondarily liable party is not a true tortfeasor.[4]

While some of the cases on this subject deal with covenants not to sue and others with releases, this distinction should not be the determining factor in the end result. The most important factor is the type of liability and the relationship *inter se* of the various allegedly liable parties rather than the type of document used to discharge liability. It must be determined whether the liability arises *only* vicariously because of the negligence of another party or whether the parties are true joint tortfeasors, both being independently negligent toward the third party.

In *Craven v. Lawson*, the Tennessee Supreme Court concluded that the UCATA is not applicable to cases involving indemnity resulting from vicarious liability. 534 S.W.2d 653, 656 (Tenn.1976). The court concluded the UCATA did not apply to situations involving vicarious liability such as that between master and servant. The court recognized "the right of the master or principal to obtain indemnity from the servant or agent in a derivative liability situation. *Where the right of full indemnity exists between persons liable in tort, no right of contribution exists.*" *Id.* at 656 (emphasis added) (citation omitted). Both the Tennessee and South Carolina versions of the UCATA specifically preserve the common law rule relating to indemnity.[5]

---

**2.** *See, e.g., Simpson v. Townsley*, 283 F.2d 743 (10th Cir.1960) (holding exoneration of primary liability removed basis for imputation of negligence).

**3.** *See, e.g., Holmstead v. Abbott G.M. Diesel, Inc.*, 27 Utah 2d 109, 493 P.2d 625 (1972) (finding covenant would not serve its purpose because of master's right to indemnity).

**4.** *See, e.g., Bacon v. United States*, 321 F.2d 880 (8th Cir.1963) (stating secondarily liable employer was not a true joint tortfeasor and thus, covenant not to sue employee released employer).

**5.** South Carolina law provides:
This chapter does not impair any right of indemnity under existing law. Where one tortfeasor is entitled to indemnity from another, the

However, there is division even among jurisdictions that have adopted the UCATA. Some jurisdictions have construed the act's definition of "tortfeasor" to include parties that are liable vicariously and have then applied other provisions of the act to prevent the release of the secondarily liable party. *See generally Yates v. New South Pizza, Ltd.*, 330 N.C. 790, 412 S.E.2d 666 (1992) (holding plaintiff could maintain action against employer based on respondeat superior after executing covenant not to sue in favor of negligent employee pursuant to North Carolina's UCATA statute).

Indemnity has been defined as "[a] contractual or equitable right under which *the entire loss* is shifted from a tortfeasor who is only technically or passively at fault to another who is primarily or actively responsible." *Black's Law Dictionary* 769 (6th ed.1990) (emphasis added). In contrast, "contribution" is defined as the:

> [r]ight of one who has discharged a common liability to recover of another also liable, the aliquot portion which he ought to pay or bear. Under principle of 'contribution,' a tort-feasor against whom a judgment is rendered is entitled to recover proportional shares of judgment from other joint tort-feasors whose negligence contributed to the injury and who were also liable to the plaintiff.

*Id.* at 328.

In South Carolina, a master or principal only vicariously liable does not have an aliquot or proportional portion he or she ought to pay, *but rather may shift the entire loss* to the servant or agent actively responsible, and may recover in full from the servant. *See Sky City Stores v. Gregg Sec. Servs.*, 276 S.C. 556, 558, 280 S.E.2d 807, 808 (1981); *Addy v. Bolton*, 257 S.C. 28, 34, 183 S.E.2d 708, 710 (1971); *Johnson v. Atlantic Coast Line R. Co.*, 142 S.C. 125, 141, 140 S.E. 443, 448 (1927); *Bell v. Clinton Oil Mill*, 129 S.C. 242, 256–57, 124 S.E. 7, 12 (1924); *Humphries v. Whitlock Combing Co.*, 309 S.C. 356, 359–60, 422 S.E.2d 154, 156–57 (Ct.App.1992); *South*

right of the indemnity obligee is for indemnity and not contribution, and the indemnity obligor is not entitled to contribution from the obligee for any portion of his indemnity obligation.
S.C.Code Ann. § 15–38–20(F) (Supp.2000).

*Carolina Ins. Co. v. James C. Greene & Co.,* 290 S.C. 171, 186, 348 S.E.2d 617, 625–26 (Ct.App.1986).

When Andrade issued a covenant not to sue in Johnson's favor, any claims she had against him were terminated. Thus, SCE&G's derivative liability based upon Johnson's conduct was extinguished. Were we to find the covenant released Johnson but not SCE&G, it would necessarily follow that SCE&G could seek indemnification from Johnson and recover the entire amount of any verdict against it from him. This would effectively strip the covenant not to sue of any real meaning and result in what the court in *Nelson v. Gillette* described as a "corrosive circle of indemnity." 571 N.W.2d 332, 339 (N.D.1997).

▆▆▆ The right of contribution exists *only* in situations involving joint tortfeasors. *See Vermeer,* 336 S.C. at 64, 518 S.E.2d at 307 ("Under South Carolina law, there can be *no* indemnity among mere joint tortfeasors.") (emphasis added). The corollary of this proposition is that the right of indemnity exists only in vicarious liability situations, and there is no right to contribution between such parties. *See Craven,* 534 S.W.2d at 656 ("Where the right of full indemnity exists between persons liable in tort, no right of contribution exists."); *see also* § 15–38–20(F). Thus, the UCATA controls only in situations involving joint tortfeasors.

▆▆▆ Just as the Tennessee version of the UCATA statute discussed in *Craven,* South Carolina law does not change the common law of indemnity. *See* § 15–38–20(F). The common law of this state provides that a covenant not to sue an employee operates as an acquittal of the employer who is only derivatively liable. "[A] covenant not to sue, which ordinarily does not release another joint-tortfeasor from liability, does operate as a release of the master, liable only under *respondeat superior,* if given to the servant responsible." *Seaboard Air Line R.R. v. Coastal Distrib.,* 273 F.Supp. 340, 343 (D.S.C.1967); *see Wade,* 339 S.C. at 520, 529 S.E.2d at 747 (stating " 'a covenant not to sue is . . . merely an agreement not to enforce an existing cause of action, and, although it may operate as a release between the parties to the agreement, it will not release a claim against joint obligors or joint tortfeasors' ") (quoting 76 C.J.S. *Release* § 4 (1994)).

We hold the covenant not to sue issued in favor of Johnson, the agent, released SCE&G, the vicariously liable principal. In conclusion, we note even were we to expand the definition of tortfeasor as North Carolina has done, we find the UCATA simply is not applicable to cases involving indemnity. Consequently, contribution cases cited by Andrade in support of her argument are inapposite to the facts of this case. Thus, we affirm the grant of summary judgment to SCE&G on this issue.

## II. Unfair and Deceptive Trade Practices Act

 Andrade next argues the trial court erred in finding SCE&G was exempt from the UTPA, S.C.Code Ann. §§ 39–5–10 to –160 (1985 & Supp.2000), and in subsequently granting SCE&G's motion for summary judgment on this cause of action. We agree.

The UTPA declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce...." S.C.Code Ann. § 39–5–20(a) (1985). Trade and commerce includes "the advertising, offering for sale, sale or distribution of any services...." S.C.Code Ann. § 39–5–10(b) (1985).

Section 39–5–40 governs exemptions from the act and states in part:

Nothing in this article shall apply to:

(a) Actions or transactions permitted under laws administered by any regulatory body or officer acting under statutory authority of this State or the United States or actions or transactions permitted by any other South Carolina State law.

S.C.Code Ann. § 39–5–40 (1985). This section has been interpreted to exempt actions or transactions allowed or authorized by regulatory agencies or by other statutes. *Taylor v. Medenica*, 324 S.C. 200, 218, 479 S.E.2d 35, 44 (1996); *see Ward v. Dick Dyer & Assocs.*, 304 S.C. 152, 156, 403 S.E.2d 310, 312 (1991) (stating only those activities that are *specifically* authorized by a regulation or another statute are exempt from the UTPA); *Carr v. United Van Lines, Inc.*, 289 S.C. 194, 199, 345 S.E.2d 734, 737 (Ct.App.1986) (holding transaction involved was exempt under the UTPA because the action was autho-

rized under regulations and tariffs administered by the Interstate Commerce Commission); *Trident Neuro–Imaging Lab. v. Blue Cross & Blue Shield of South Carolina, Inc.,* 568 F.Supp. 1474, 1483 (D.S.C.1983) (concluding Blue Cross was exempt under the UTPA because the South Carolina Commission on Insurance specifically approved Blue Cross' exclusion of coverage on physician-owned CAT scans).

In support of its summary judgment motion based on its alleged exemption under the UTPA, SCE&G presented a copy of the June 7, 1993 order from the South Carolina Public Service Commission approving SCE&G's application for a rate increase. The order indicates the PSC is required by section 58–37–20 of the South Carolina Energy Conservation and Efficiency Act of 1992 to encourage utilities to invest in cost-effective energy-efficient technologies and energy conservation programs.

Andrade argues that in regard to the Quality Dealer Program, "[t]he PSC Order did not specifically authorize the program ..." We agree. We find the thrust of the PSC's order deals primarily with SCE&G's rate structure. The order does not specifically authorize, regulate, or describe how the Quality Dealer Program should be designed or implemented. In fact, the words "Quality Dealer Program" are not specifically mentioned anywhere in the PSC's lengthy order.

The order does discuss expenses allocated to SCE&G's *demand-side management programs* which are "designed to either reduce energy demand (kw), reduce energy usage (kwh) or to shift usage to non-peak periods, increasing efficiency, thereby reducing SCE&G's requirements to build new capacity." SCE&G's Great Appliance Trade–Up program is one such demand-side management program.[6] However, in the

---

6. The evidence shows SCE&G considered the Quality Dealer Program a separate program from the Great Appliance Trade-up Program because it had a separate agreement with its Quality Dealers, as well as descriptions of the program. For example, in the Great Appliance Trade–Up Program Training Guidelines for Quality Dealers, SCE&G provided the following guidelines for its Quality Dealers:

*Receiving Training Credit*
1. Quality Dealers must install Heat Pumps which meet the 1993 GATU Program guidelines.

supplemental stipulation of the PSC staff and SCE&G, the Quality Dealer Program is *not* listed as one of SCE&G's demand-side management programs.

Even if the PSC's order can be construed as authorizing the program, it falls far short of providing any regulatory control over its creation or implementation. Thus, while the PSC noted Quality Dealers would install the air conditioners, it neither defined what a Quality Dealer was nor placed criteria upon the selection of Quality Dealers.

SCE&G submitted an affidavit from David Butler, General Counsel for the PSC, in support of its motion for summary judgment. Butler stated the PSC would investigate any complaint filed regarding the Quality Dealer Program and take the appropriate action. However, this investigation would be based on: (1) the PSC's general power to supervise and regulate the rates of public utilities under S.C.Code Ann. § 58-3-140 (Supp.2000), and (2) the required compliance of electric utilities with the PSC's orders pursuant to S.C.Code Ann. § 58-27-40 (1977). It apparently would not take place pursuant to any preauthorized plan of regulating or controlling the Quality Dealer Program. These sections cited by SCE&G and the PSC's order are broad grants of authority and too general for us to conclude as a matter of law that the Quality Dealer Program was specifically authorized by an agency or by a statute to such an extent that it should be exempt from the provisions of the UTPA.

In *Taylor*, the court found that a medical laboratory's conduct in billing for numerous medically unwarranted tests was not exempt under the UTPA. 324 S.C. at 218, 479 S.E.2d. at 44. Similarly, we find the PSC's order indicating that SCE&G was directed to create a program encouraging energy conservation and efficiency does not exempt SCE&G's conduct in allegedly failing to oversee its Quality Dealer Program, a program it created pursuant to general statutory and regulatory directions. In the final analysis, SCE&G had discretion in creating the Quality Dealer Program and in determining the qualifications for and criteria of those selected as Quality

---

2. *Installations must meet the Quality Dealer Program guidelines* (emphasis added).

Dealers thereunder. We therefore reverse the grant of summary judgment in favor of SCE&G on this issue.

## III. Directed Verdict on Negligence

Andrade contends the trial court erred in granting SCE&G a directed verdict on her negligence cause of action. We agree.

"When this court reviews a grant of directed verdict, the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the non-prevailing party." *Davis v. Tripp*, 338 S.C. 226, 238, 525 S.E.2d 528, 534 (Ct.App.1999). "If the evidence is susceptible to more than one reasonable inference, the case should be submitted to the jury." *Id.* (quoting *Quesinberry v. Rouppasong*, 331 S.C. 589, 594, 503 S.E.2d 717, 720 (1998)).

"The elements for a cause of action for the tort of negligence are: (1) a duty owed to the plaintiff by the defendant, (2) a breach of that duty by the defendant, and (3) damages proximately resulting from the breach of duty." *Hubbard v. Taylor*, 339 S.C. 582, 588, 529 S.E.2d 549, 552 (2000). To maintain a negligence action, the defendant must owe a legal duty of care to the plaintiff. *Id.* Duty is generally defined as "the obligation to conform to a particular standard of conduct toward another." *Id.* (quoting *Shipes v. Piggly Wiggly St. Andrews, Inc.*, 269 S.C. 479, 483, 238 S.E.2d 167, 168 (1977)). "The existence of a duty owed is a question of law for the courts." *Washington v. Lexington County Jail*, 337 S.C. 400, 405, 523 S.E.2d 204, 206 (Ct.App.1999).

As the court in *Hubbard* stated, "*an affirmative legal duty to act may be created by statute, contract, relationship, status, property interest, or some other special circumstance.*" 339 S.C. at 589, 529 S.E.2d at 552 (emphasis added).

Andrade argues the court erred in holding SCE&G did not owe her a duty under the Quality Dealer Program. Viewing the record in the light most favorable to Andrade, we agree. The evidence [7] raises the inference SCE&G owed a

---

7. Andrade's brief discusses evidence proffered but not admitted at trial. The depositions discussed during argument to the trial court are not

duty of care to Andrade to ensure the proper installation of her HVAC systems.

SCE&G's Quality Dealer Program Guidelines stated "SCE&G's HVAC Quality Dealer Program is designed to encourage *proper installation* of high efficiency heating and cooling systems. The program incorporates *high standards* of system design, *installation, and maintenance.*" (emphasis added).

Under the agreement between SCE&G and its Quality Dealers, the Quality Dealers agreed to meet and adhere to all installation requirements, mediation procedures, and to abide by the inspection policy. In turn, SCE&G agreed to promote high efficiency HVAC equipment and quality HVAC installations to its customers.

The program agreement further contained a long list of installation requirements that must be met by each Quality Dealer.[8] The agreement also required Quality Dealers to have certain credentials, provide prompt service to all customers, and to participate in yearly training provided by SCE&G. The agreement further committed SCE&G to a specific procedure involving mediation toward the handling of customer complaints which set forth specific requirements for certain action to be taken and concluded that discrepancies were expected to be corrected within thirty days after their report.

We conclude the Quality Dealer Agreement provides evidence of a contractual duty undertaken by SCE&G to oversee the *proper* installation of HVAC systems and to address customer complaints regarding improper installation. Viewing the evidence in the light most favorable to Andrade, we find the trial court committed reversible error in granting SCE&G a directed verdict on Andrade's negligence claim.

included in the record. Consequently, we have not considered such evidence in our deliberations.

8. Andrade testified fifteen code violations occurred as a result of Sea Island's faulty installation of her HVAC systems. In the SCE&G–Quality Dealer agreement, SCE&G instructed the Quality Dealers to "[s]elect and *install* systems and accessory equipment in accordance with *all* local, state and national codes." (emphasis added).

232

For the foregoing reasons, the judgment of the trial court is hereby

**AFFIRMED IN PART AND REVERSED IN PART.**

HOWARD and SHULER, JJ., concur.