559 S.E.2d 908

Timothy T. WOODRUM and Gina M. Woodrum, individually and as husband and wife, Plaintiffs Below,

v.

Jerome G. JOHNSON, M.D., Morgantown Surgical Associates, Inc., Defendants Below,

and

Monongalia Health System, Inc., and Monongalia County General Hospital Company, d/b/a Monongalia General Hospital, Defendants Below.

No. 28857.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 3, 2001.

Decided Dec. 12, 2001.

Beth A. Raffle, Esq., Susan S. Brewer, Esq., Ancil G. Ramey, Esq., Steptoe & Johnson, PLLC, Morgantown, for Defendants Monongalia Health Systems, Inc., and Monongalia County General Hospital Company, Inc.

Wesley W. Metheney, Esq., Paul T. Farrell, Jr., Esq., Wilson, Frame, Benninger & Metheney, PLLC, Morgantown, Barry Hill, Esq., Wheeling, for West Virginia Trial Lawyers Association, Amicus Curiae.

Curtis G. Power III, Esq., Robert W. Dinsmore, Esq., Bowles Rice McDavid Graff & Love, PLLC, Winchester, for Plaintiffs.

McGRAW, Chief Justice.

This case comes to the Court on certified question from the Circuit Court of Monongalia County, and requires that we resolve the question of whether a plaintiff's release of a primarily liable tortfeasor necessarily releases other parties defendant who may be derivatively or vicariously liable based upon their relationship with the tortfeasor. Specifically, the circuit court has posed the following question of law:

> Does the settlement with and release of a physician, who is an alleged ostensible agent of a hospital, necessarily release the hospital from further liability for the alleged malpractice of the physician where: (1) the physician is not an employee of the hospital; (2) the only negligence alleged is that of the physician; and (3) there is no allegation of negligence against the hospital?

The circuit court answered this question in the negative. We agree with this conclusion, and determine that a plaintiff's release of a primarily liable defendant should not be permitted to have the potentially unintended effect of releasing other liable parties.

## I.

### BACKGROUND

In April 1999, Timothy Woodrum, together with his wife, instituted an action in the Circuit Court of Monongalia County, alleging that Dr. Jerome Johnson [1] was negligent in failing to properly diagnose and treat an infection-related empyema of his left chest cavity. Monongalia General Hospital [2] was

---

1. Dr. Johnson's practice group, Morgantown Surgical Associates, Inc., was also named as a party defendant.

2. Monongalia General Hospital is owned and operated by defendant Monongalia County General Hospital Company, which in turn is a wholly-owned subsidiary of defendant Monongalia Health Systems, Inc. Both are collectively referred to herein as the "Hospital."

also named as a party defendant, based upon an allegation that Dr. Johnson was an ostensible agent of it, thus exposing it to vicarious liability under *Torrence v. Kusminsky*, 185 W.Va. 734, 408 S.E.2d 684 (1991) (holding that a hospital is estopped from denying the agency status of physicians practicing in its emergency room).[3]

Plaintiffs settled with Dr. Johnson and his practice group on June 13, 2000, after extensive discovery had already been completed. The "Release and Settlement Agreement" executed by the settling parties contained the following reservation of rights: [4]

> It is understood by the parties to this Release and Settlement Agreement that [plaintiffs] specifically reserve[ ] their right to prosecute their claims or causes of action against the remaining defendants in Civil Action No. 99–C–157, including without limitation, the cause of action alleging that Dr. Johnson was an agent and/or employee of the remaining defendants, Monongalia Health Systems, Inc., Monogalia County General Hospital, d/b/a Monongalia General Hospital, at the times that Dr. Johnson provided health care services to Timothy T. Woodrum.

The settlement amount remains undisclosed under the terms of the settlement agreement, although it is undisputed that plaintiffs accepted an amount less than the maximum amount payable under the defendant physician's malpractice insurance policy.

Upon being informed of the settlement between plaintiffs and the defendant physician, the Hospital moved for summary judgment, arguing that the release executed by plaintiffs inured to their benefit by operation of law. Citing the common-law rule applicable in several other jurisdictions, the Hospital argued that the release of an agent should also release the principal, where the plaintiff's claim against the principal is based solely upon ostensible agency. Upon determining that courts in other jurisdictions are split on this issue, and finding no West Virginia authority on point, the circuit court denied the Hospital's summary judgment motion, and certified the question to this Court pursuant to W. Va.Code § 58–5–2 (1998) (Repl. Vol. Supp. 2001).

## II.

### STANDARD OF REVIEW

◼ As stated in syllabus point one of *Gallapoo v. Wal–Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996), "[t]he appellate standard of review of questions of law answered and certified by a circuit court is *de novo.*" *Accord*, syl. pt. 2, *Keplinger v.*

---

3. Plaintiffs have contended in their briefs and oral argument before this Court that the Hospital faces liability both as the ostensible principal of Dr. Johnson, and as an active tortfeasor. We note that while the plaintiffs' complaint appears to support both theories, plaintiffs in contesting the Hospital's motion for summary judgment made no mention of any independent liability on the part of the Hospital, but instead confined their argument to the theory that the Hospital was liable on the basis of ostensible agency. We see no reason why this development should alter our present analysis, since the question posed by the circuit court remains pertinent to at least one portion of plaintiffs' current theory of the case, and because the lower court will no doubt be in a position to deal with this matter during the course of future proceedings.

4. Although nominally designated as a release, the instrument at issue in this case could more properly be construed as a covenant not to sue, given the presence of an express reservation of rights to pursue other parties defendant. The formal distinction between a release and a covenant not to sue has been described as follows:

> A covenant not to sue is to be distinguished from a release in that it is not a present abandonment or relinquishment of the right or claim but is merely an agreement not to sue on an existing claim. It does not extinguish the cause of action. As between the parties to the agreement, the final result is the same in both cases. The difference is primarily in the effect as to third parties, and is based mainly on the fact that in the case of a release there is an immediate release or discharge, whereas in the other case there is merely an agreement not to prosecute a suit. A covenant not to sue is nothing but a contract, and should be so construed.

66 Am.Jur.2d *Release* § 2, at 679 (1973) (footnotes omitted). *See also Goldstein v. Gilbert*, 125 W.Va. 250, 253, 23 S.E.2d 606, 608 (1942). We are not inclined to draw any significant distinctions on this basis. As the Restatement (Second) of Torts observes, this would amount to an "artificial distinction," which in the past has "frequently resulted in the unintended and unpaid-for discharge of one of the tortfeasors. This earlier rule is not consistent with the modern American point of view." *Restatement (Second) of Torts* § 885 cmt. b, at 334 (1979).

*Virginia Elec. and Power Co.*, 208 W.Va. 11, 537 S.E.2d 632 (2000); *Potesta v. United States Fid. & Guar. Co.*, 202 W.Va. 308, 314, 504 S.E.2d 135, 141 (1998); *Griffis v. Griffis*, 202 W.Va. 203, 208, 503 S.E.2d 516, 521 (1998).

## III.

## DISCUSSION

The Hospital urges this Court to recognize "the well-settled maxim of common law that when a plaintiff's only claim against a principal is under the theory of ... agency, a release of the agent from the suit also releases the principal." We note at the outset that although this common-law rule has been in force for some time in other states, it has never before been expressly adopted in this jurisdiction.[5]

The issue was recently recognized, but not resolved, in *Dunn v. Kanawha County Bd. of Educ.*, 194 W.Va. 40, 459 S.E.2d 151 (1995), where we said in the context of a product liability suit that

it is arguable that basic fairness and sound public policy dictate that a settlement by a plaintiff with the manufacturing defendant solely responsible for the defective product covers all damages caused by that product and extinguishes any right of the plaintiff to pursue others in the chain of distribution who did not make the product, contribute in any way to the defect, or commit any independent acts of negligence or fault. However, this issue was not raised

by this certified question, and we leave its resolution for a later time.

*Id.* at 47, 459 S.E.2d at 158.

The only other reference to this issue in our past cases came in *State ex rel. Bumgarner v. Sims*, 139 W.Va. 92, 79 S.E.2d 277 (1953), where the Court went so far as to indicate that W. Va.Code § 55–7–12 (1931) (Repl. Vol. 2000) abrogates the common-law rule that the releases of an agent necessarily releases the agent's principal:

In this jurisdiction the common-law rule ... that 'Where both master and servant are liable to a third party for a tort of the servant, a valid release of either master or servant from liability for the tort operates to release the other,' has been abrogated, in part, by [W.Va.] Code, 55–7–12. Section 12 reads: 'A release to, or an accord and satisfaction with, one or more joint trespassers, or tort-feasors, shall not [inure] to the benefit of another such trespasser, or tort-feasor, and shall be no bar to an action or suit against such other joint trespasser, or tort-feasor, for the same cause of action to which the release or accord and satisfaction relates.'

139 W.Va. at 112–13, 79 S.E.2d at 290 (citation omitted). This construction apparently stemmed from the Court's observation that "[t]he relation of master and servant in those cases, in which the doctrine of *respondent superior* applies, is joint, and the parties should be regarded as though they were joint tort-feasors." *Id.* at 111, 79 S.E.2d at 289 (citing *Wills v. Montfair Gas Coal Co.*, 97 W.Va. 476, 125 S.E. 367 (1924)).[6]

---

**5.** The earliest reference to such rule even in Virginia did not occur until 1936, where it was treated as an analogue of the common-law rule that the release of one joint tortfeasor released all others who were liable for the same injury. *See McLaughlin v. Siegel*, 166 Va. 374, 185 S.E. 873 (1936); *see also Federal Land Bank of Baltimore v. Birchfield*, 173 Va. 200, 225, 3 S.E.2d 405, 415 (1939) (observing that the "release of the servant, from responsibility for the tort actually committed by him, releases the master") (citing *McLaughlin* ).

**6.** In *Wills*, we had stated that

[t]here is no reason perceived why the Coal Company and its superintendent who employed and permitted the infant to work in the mine cannot be joined as joint tort-feasors. *See Barger v. Hood*, 87 W.Va. 78, 104 S.E. 280

[ (1920) ]. If the tortious act be jointly done, or severally done though for a similar purpose and at the same time, without concert of action, the actors are joint tort-feasors. Ordinarily both parties guilty of concurrent negligent acts may be joined in the action, even though they had no common purpose, and there was no concert of action. *Johnson v. Chapman*, 43 W.Va. 639, 28 S.E. 744 [ (1897) ]. There is no misjoinder of parties in this count. While the decisions are not harmonious, the weight of authority backed by reason sustains the right of an injured person to join in the same action master and servant where the right of action springs from the wrongful act of the servant for which the master is responsible. *Wills*, 97 W.Va. at 478, 125 S.E. at 366–67; *see also Harless v. First Nat. Bank in Fairmont*, 169 W.Va. 673, 684, 289 S.E.2d 692, 699 (1982).

In *Bumgarner,* the plaintiff had been accidentally shot by Coiner, a prison guard, while the latter was searching for an escaped convict. The plaintiff later brought a successful negligence action against Coiner, which resulted in a $3,000 judgment. A later attempt to collect on the judgment through execution proved unsuccessful, however, and Coiner's liability was later discharged in bankruptcy. The plaintiff subsequently sought relief from the Court of Claims, which awarded the plaintiff $2,000. Yet, the Auditor refused to honor the resulting legislative appropriation, asserting that it was unconstitutional insofar as the State was not morally obligated to compensate the plaintiff.

In determining whether the plaintiff in *Bumgarner* was entitled to payment of the award made by the Court of Claims, the Court addressed the "question whether the unsatisfied judgment in [plaintiff's] favor and against Coiner alone, entered by the Circuit Court of Roane County in the action at law instituted by the [plaintiff] against Coiner, and whether Coiner's bankruptcy and his discharge in the bankruptcy proceeding, without any satisfaction of [plaintiff's] claim, either in whole or in part, would serve to release Coiner's employer, if such employer were a private person and not the State of West Virginia." *Bumgarner,* 139 W.Va. at 111, 79 S.E.2d at 289. In answering this question, the Court held that "[a]s the [plaintiff's] judgment against Coiner ... was not satisfied, either in whole or in part, under the executions issued on the judgment or in the bankruptcy proceeding, the judgment, in our opinion, would not serve to bar [plaintiff's]

claim against the State of West Virginia based on a moral obligation; and we so hold under the provisions of [W.Va.] Code, 55–7–12, and under the authority of *Griffie v. McClung,* [5 W.Va. 131 (1872)]. *Bumgarner,* 139 W.Va. at 116, 79 S.E.2d at 292.[7]

The holding in *Bumgarner* was predicated at least in part upon the Court's conclusion regarding the abrogation of the common-law rule concerning the effect that the release of a primarily liable agent or employee has on the continued liability of a vicariously responsible principal or employer. As it was already accepted law that a judgment against one tortfeasor did not bar suit against another who was jointly liable, *see Griffie v. McClung, supra,* such rule furnished the only logical resistance to the ultimate holding in *Bumgarner.* Thus, on *stare decisis* grounds,[8] we would be hard-pressed to disregard the relevant statement in *Bumgarner* as dictum. *See Miller v. Huntington & Ohio Bridge Co.,* 123 W.Va. 320, 329, 15 S.E.2d 687, 692 (1941) (the fact that a point of law does not appear in the syllabus of an opinion does not relegate it to the status of mere dictum). "When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 67, 116 S.Ct. 1114, 1129, 134 L.Ed.2d 252 (1996); *see also County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U.S. 573, 668, 109 S.Ct. 3086, 3141, 106 L.Ed.2d 472 (1989) ("As a general rule, the principle of *stare decisis*

---

**7.** The *Bumgarner* Court reiterate this holding in the syllabus of the opinion, stating as follows:

> Under the common law, as it existed in this State prior to the enactment of Section 7, Chapter 136, West Virginia Code of 1868, now Code, 55–7–12, and under the present statute contained in Code, 55–7–12, a judgment obtained by a person injured through the negligence of the employee of another, while the employee was acting within the scope of his employment, which has not been satisfied in whole or in part under execution or executions issued thereon, or in a proceeding in bankruptcy, in which the employee is the bankrupt, will not bar a recovery against the employer for the same injury in a separate action at law; and by the same token will not bar a claim against the State by the injured person to recover compen-

sation for injuries inflicted, based upon the moral obligation of the State to pay. Syl. pt. 9, *Bumgarner.*

**8.** As this Court explained in *Dailey v. Bechtel Corp.,* 157 W.Va. 1023, 207 S.E.2d 169 (1974):

> "*Stare decisis* is not a rule of law but is a matter of judicial policy.... It is a policy which promotes certainty, stability and uniformity in the law. It should be deviated from only when urgent reason requires deviation.... In the rare case when it clearly is apparent that an error has been made or that the application of an outmoded rule, due to changing conditions, results in injustice, deviation from that policy is warranted."

*Id.* at 1029, 207 S.E.2d at 173 (quoting *Adkins v. St. Francis Hosp. of Charleston,* 149 W.Va. 705, 718, 143 S.E.2d 154, 162 (1965)).

directs us to adhere not only to the holdings of our prior cases, but also to their explication of the governing rules of law.") (Kennedy, J., concurring and dissenting).[9]

Nor are we convinced that there is any compelling reason to abandon the stance taken in *Bumgarner.* There is broad and diverse disagreement among courts as to whether the release of a primarily liable defendant necessarily inures to the benefit of parties whose liability is purely derivative.[10] The Hospital, embracing one side of this debate, emphatically argues that "the issue before this Court is one of the law of vicarious liability, not of joint tortfeasors," and directs us to *Theophelis v. Lansing General Hosp.,* 430 Mich. 473, 424 N.W.2d 478 (1988), where a plurality of a heavily divided Michigan Supreme Court stated that

> common-law rules which once governed contribution rights among joint and concurrent tortfeasors should not be confused with the deeply rooted common-law doctrine that release of an agent discharges the principal for vicarious liability. The rationale for the latter rule is entirely different and is grounded on the very nature of the principal's derivative liability.

*Id.* at 483, 424 N.W.2d at 482 (plurality opinion). Some courts have, in accord with this reasoning, stressed the "fundamental distinction between the full recovery permitted under the doctrine of joint and several liability, and the limitations inherent in a claim that

---

**9.** We recognize that arguably there may be flaws in *Bumgarner's* reasoning as it relates to the scope of W. Va.Code § 55–7–12. For example, in amending the statute in 1931, the Legislature indicated that its addition of the word "tortfeasor" was intended so as to make the statute applicable to "wrongdoers." *See* Revisers' Note to W.Va.Code of 1931. Of course, the Legislature also made clear its intent to codify this Court's holding in syllabus point one of *Leisure v. Monongahela Valley Traction Co.,* 85 W.Va. 346, 101 S.E. 737 (1920), where we concluded that the term "trespasser" broadly includes "every person guilty of an tortious infringement upon the rights of another." But it is clear that *Bumgarner* did not rely entirely upon the statute. It is significant that the Court indicated that abrogation of the common-law rule dealing with the consequences of releasing an agent was only "in part" dictated by § 55–7–12. As evidence by the syllabus of *Bumgarner, see* note 7, *supra,* as well as related text within the opinion, 139 W.Va. at 114, 79 S.E.2d at 291, such rule was also implicitly rejected as a matter of common law, based partially upon the reasoning of *Bloss v. Plymale,* 3 W.Va. 393, 1869 WL 1926 (1869), which long ago abrogated the parallel rule that the release of one joint tortfeasor necessarily releases all others who are jointly liable. The Court has more recently made clear that § 55–7–12 is "merely expositive of the common-law rule and makes no change in the respective inchoate liability of joint tort-feasors to the injured party." *Thornton v. Charleston Area Med. Ctr.,* 158 W.Va. 504, 510, 213 S.E.2d 102, 106 (1975) (citations omitted).

**10.** *See* Vitauts M. Gulbis, Annotation, *Release of, or Covenant Not to Sue, One Primarily Liable for Tort, But Expressly Reserving Rights Against One Secondarily Liable, as Bar to Recovery Against Latter,* 24 A.L.R.4th 547 (1983); Annotation, *Release of (or Covenant not to Sue) Master or Principal as Affecting Liability of Servant or Agent for Tort or Vice Versa,* 92 A.L.R.2d 533 (1963). Whether by statute or by way of common law, several jurisdictions have rejected the proposi-

tion that the release of, or covenant not to sue, a primarily liable defendant extinguishes a plaintiff's right to obtain a judgment against a party that is derivatively liable. *See, e.g., Alaska Airlines, Inc. v. Sweat,* 568 P.2d 916 (Alaska 1977); *Hovatter v. Shell Oil Co.,* 111 Ariz. 325, 529 P.2d 224 (1975); *JFK Med. Ctr., Inc. v. Price,* 647 So.2d 833 (Fla.1994); *Saranillio v. Silva,* 78 Hawai'i 1, 889 P.2d 685, 698 (1995); *Pelo v. Franklin College of Indiana,* 715 N.E.2d 365 (Ind. 1999); *Van Cleave v. Gamboni Constr. Co.,* 101 Nev. 524, 706 P.2d 845 (1985); *Cartel Capital Corp. v. Fireco of New Jersey,* 81 N.J. 548, 410 A.2d 674 (1980); *Plath v. Justus,* 28 N.Y.2d 16, 319 N.Y.S.2d 433, 268 N.E.2d 117 (1971); *Knutson v. Morton Foods, Inc.,* 603 S.W.2d 805 (Tex. 1980). On the other hand, a number of states take the opposite view based upon similarly diverse reasoning. *See, e.g., Gilbert v. Sycamore Mun. Hosp.,* 156 Ill.2d 511, 622 N.E.2d 788, 190 Ill.Dec. 758 (1993); *Biddle v. Sartori Mem'l Hosp.,* 518 N.W.2d 795 (Iowa 1994); *Atkinson v. Wichita Clinic, P.A.,* 243 Kan. 705, 763 P.2d 1085 (1988); *Copeland v. Humana of Kentucky, Inc.,* 769 S.W.2d 67 (Ky.Ct.App.1989); *Anne Arundel Med. Ctr., Inc. v. Condon,* 102 Md.App. 408, 649 A.2d 1189, 1193 (1994); *Hoffmann v. Wiltscheck,* 411 N.W.2d 923 (Minn.Ct.App.1987); *McCurry v. School Dist. of Valley,* 242 Neb. 504, 496 N.W.2d 433 (1993); *Horejsi v. Anderson,* 353 N.W.2d 316, 318 (N.D.1984); *Mid–Continent Pipeline Co. v. Crauthers,* 267 P.2d 568 (Okla. 1954); *Mamalis v. Atlas Van Lines, Inc.,* 522 Pa. 214, 560 A.2d 1380 (1989); *Craven v. Lawson,* 534 S.W.2d 653 (Tenn.1976). We note that several of the jurisdictions that take the restrictive position nevertheless distinguish between a release and a covenant not to sue, giving preclusive effect only to the former instrument. *See, e.g., Atlas Tack Corp. v. DiMasi,* 37 Mass.App.Ct. 66, 637 N.E.2d 230 (1994); *Theophelis v. Lansing General Hosp.,* 430 Mich. 473, 424 N.W.2d 478 (1988); *Riley v. City of Cincinnati,* 46 Ohio St.2d 287, 348 N.E.2d 135 (1976).

rests on the doctrine of vicarious liability." *Biddle v. Sartori Mem'l Hosp.*, 518 N.W.2d 795, 798 (Iowa 1994). These courts take the position that because "vicarious liability derives solely from the principal's legal relation to the wrongdoer, settlement with the tortfeasor removes the basis for any additional recovery from the principal upon the same acts of negligence." *Id.; see also Estate of Williams v. Vandeberg*, 620 N.W.2d 187, 190 (S.D.2000); *Theophelis*, 430 Mich. at 490–91, 424 N.W.2d at 486 (plurality opinion). As the North Dakota Supreme Court had earlier explained:

> The "percentage of negligence" attributable to the conduct of the servant constitutes the entire "single share" of liability attributable jointly to the master and servant. . . . Because this percentage of negligence represents the "single share" of liability covered by the common liability of the master and servant, the master is necessarily released from vicarious liability for the released servant's misconduct.

*Horejsi v. Anderson*, 353 N.W.2d 316, 318 (N.D.1984).

If there were practical significance to this "single share" theory, however, it would necessarily prohibit an injured plaintiff from maintaining an action solely against a derivatively liable defendant. *See Theophelis*, 430 Mich. at 519, 424 N.W.2d at 498 (Levin, J., concurring in judgment). But this Court has consistently repudiated such an approach, taking the position that a plaintiff is permitted to sue the principal either alone or together with the agent. In *Bumgarner*, the Court stated that

> the relation between the master and servant, the latter acting within the scope of his employment, is joint and several in the sense that both master and servant are liable for injuries caused by the negligent wrongdoing of the servant, acting within the scope of his employment, and liability for such injuries may be asserted in an action at law against the master and servant jointly or against each of them in a separate action at law.

Syl. pt. 8, in part, *Bumgarner, supra; see also Musgrove v. Hickory Inn, Inc.*, 168 W.Va. 65, 68, 281 S.E.2d 499, 501 (1981); *Muldoon v. Kepner*, 141 W.Va. 577, 583–84, 91 S.E.2d 727, 731 (1956).

■ In *O'Dell v. Universal Credit Co.*, 118 W.Va. 678, 191 S.E. 568 (1937), the plaintiff's decedent had been killed when he was struck by an automobile driven by Hager, the purported agent of the Universal Credit Company. Plaintiff subsequently brought an action against both Hager and Universal, but later voluntarily dismissed Hager prior to trial. On appeal, Universal argued that Hager's dismissal necessarily prohibited further proceedings against it, "since its liability [was] dependent upon Hager's." *Id.* at 680, 191 S.E. at 570. The Court rejected this argument, stating that "[t]he effect of dismissing Hager was to relinquish the instant action against *him only." Id.* (emphasis in original). We went on to hold in syllabus point one of *O'Dell:*

> In a joint action of tort against master and servant, the plaintiff may dismiss the servant for a reason not going to the merits, without impairing his right to proceed against the master, although the latter is liable only under the doctrine of respondeat superior.

*O'Dell* therefore permits a plaintiff to voluntarily dismiss a negligent agent while still maintaining an action against the vicariously liable principal. It would be peculiar indeed if we were to allow a plaintiff to gratuitously dismiss a primarily liable tortfeasor without consequence to the right to proceed against a vicariously responsible defendant, but impose the harsh sanction of total preclusion simply because the plaintiff was successful in obtaining some measure of recompense for his or her injuries.

What is instructive about our prior cases is that while the Court has clearly acknowledged the fact that there is a technical difference between joint tortfeasors and those whose liability is derivative or vicarious, *see, e.g., Wills v. Montfair Gas Coal Co.*, 97 W.Va. at 478, 125 S.E. at 368 (explaining that actors may be considered joint tortfeasors "[i]f the tortious act be jointly done, or severally done for a similar purpose and at the same time, without concert of action") (citation omitted), we have never used this difference to make a practical distinction between the two in the current context. Hence our statement in *Bumgarner* that vicariously lia-

ble parties "should be regarded as though they were joint tort-feasors." 139 W.Va. at 111, 79 S.E.2d at 289 (citation omitted); *see also Harless,* 169 W.Va. at 684, 289 S.E.2d at 699 (noting that in *Bumgarner* the Court "characterized the relationship of master and servant as similar to joint tortfeasors").

The Supreme Court of New Jersey took a similar approach in *Cartel Capital Corp. v. Fireco of New Jersey,* 81 N.J. 548, 410 A.2d 674 (1980), where it held that the release of a negligent manufacturer did not have the effect of releasing a retailer who was sued on the basis of strict liability:

> "The general rule in this jurisdiction is that a release of one tortfeasor will not release others who may also be liable to plaintiff for his harm unless the release is so intended or the plaintiff receives as a result thereof either full satisfaction or satisfaction intended as such.... While that departure from the common law was formulated in the context of multiple acts of negligence committed by concurrent tortfeasors, each of whom was himself actually rather than merely vicariously liable, we see no reason why the rule should not apply as well to the single act of negligence for which both the actual wrongdoer and his master or principal are each independently liable. The rationale of the rule is equally apposite whether the liability is actual or vicarious namely, that plaintiff is entitled to pursue all those who are independently liable to him for his harm until one full satisfaction is obtained."

*Id.* at 560, 410 A.2d at 680 (quoting *McFadden v. Turner,* 159 N.J.Super. 360, 366–67, 388 A.2d 244, 246–47 (App.Div.1978)) (internal citations omitted). The Court agrees with this statement, finding that it cogently explains the approach we have taken in the past.

■ Our emphasis has consistently been upon giving full effect to the terms of settlement agreements. As we stated in syllabus point two of *Conley v. Hill,* 115 W.Va. 175, 174 S.E. 883 (1934), *overruled on other grounds, Thornton v. Charleston Area Med. Ctr.,* 158 W.Va. 504, 213 S.E.2d 102 (1975), "[a] release ordinarily covers only such matters as may fairly be said to have been within the contemplation of the parties at the time of its execution." *See also Thornton,* 158

W.Va. at 515, 213 S.E.2d at 108 (stating that "we deem it patently illogical to conclusively presume, in the absence of particular language indicative of such intention, that a release of the original tort-feasor bars recovery from the subsequent tort-feasor"). Thus, like the Indiana Supreme Court, "[w]e perceive no valid reason to disregard the intent of parties to a release regardless of the theory under which multiple potentially liable parties may be pursued." *Pelo v. Franklin College of Indiana,* 715 N.E.2d 365, 366 (Ind. 1999).

■ If the rule advocated by the hospital holds any currency in the distinction it makes between primarily liable tortfeasors and those parties whose liability is entirely derivative, it must rest upon the ground of fundamental fairness. In this regard, however, we simply do not see how the Hospital could in any way be prejudiced by a rule which permits plaintiffs to proceed further against it in the present matter. As we have seen, had they chosen, the plaintiffs could have appropriately brought an action solely against the Hospital, or otherwise voluntarily dismissed the defendant physician. Significantly, a vicariously liable defendant's right to implied indemnity is not affected by settlement between a plaintiff and other liable parties. *See, e.g.,* syl. pt. 7, *Hager v. Marshall,* 202 W.Va. 577, 505 S.E.2d 640 (1998) ("In non-product liability multi-party civil actions, a good faith settlement between a plaintiff and a defendant will extinguish the right of a non-settling defendant to seek implied indemnity unless such non-settling defendant is without fault."). The substantive impact of the settlement agreement in this case is therefore not materially different from what would result if plaintiffs had chosen to utilize procedures that have long been permitted under West Virginia law.

The Hospital raises the point that, given its right to indemnity, any derivative action against it at this juncture would be circuitous, in that an exercise of its right to indemnity would result in "any verdict in excess of [Dr. Johnson's] settlement [being] the ultimate responsibility of such defendant physician." This line of reasoning has been

embraced by several courts. As the Court of Appeals of South Carolina remarked:

> Were we to find the covenant released [the agent] but not [the principal], it would necessarily follow that [the principal] could seek indemnification from [the agent] and recover the entire amount of any verdict against it from him. This would effectively strip the covenant not to sue of any real meaning and result in what the court in *Nelson v. Gillette* described as a "corrosive circle of indemnity." 571 N.W.2d 332, 339 (N.D.1997).

*Andrade v. Johnson*, 345 S.C. 216, 226, 546 S.E.2d 665, 670 (S.C.Ct.App.2001); *see also Williams v. Vandeberg*, 620 N.W.2d 187, 191 (S.D.2000) (holding that release of agent releases principal notwithstanding express reservation of rights, noting that such conclusion "fosters the principal of finality while attempting to limit circuity of action and multiplicity of lawsuits"); *L.C. v. R.P.*, 563 N.W.2d 799, 801 (N.D.1997) (holding that rule is "premised on avoiding a circle of indemnity that would have resulted if the release of the servant did not also release the master from vicarious liability").

Other courts, however, take the opposite view concerning the consequences of a principal's right to indemnity. The Supreme Court of Texas, in *Knutson v. Morton Foods, Inc.*, 603 S.W.2d 805 (Tex.1980), addressed a factual scenario little different than that posed by this case. The plaintiff Knutsons were injured as a result of an automobile collision allegedly caused by Chastain, who at the time of the accident was purportedly acting within the scope of her employment with defendant Morton Foods. 603 S.W.2d at 806. The Knutsons brought an action against both Chastain and her husband, as well as Morton Foods, but later settled with the Chastains for $10,000, executing a release that included an express reservation of their right to pursue a judgment against Morton Foods. *Id.*

Just as the Hospital has done in this case, Morton Foods argued in *Knutson* that the plaintiffs should be prohibited from proceeding against such course because it would result in a confusing circuity of action. The *Knutson* Court, while recognizing the fact that the Chastains could potentially be sub-ject to an indemnity suit by Morton Foods, rejected this argument, stating that

> [t]here are reasons ... which favor a recognition of partial settlements ... to this case and situation. We have long recognized that encouraging settlement and compromise is in the public interest.... The instant decision will aid in the achievement of that goal. A plaintiff will be able to settle with a tortfeasor who acts for another without being fearful of losing his cause of action against the party that may be liable under *respondeat superior*. At the same time, the party who is liable under *respondeat superior* will retain complete access to the courts for a full adjudication of his liabilities and his rights of indemnification.

> The Knutsons and Chastains knew about these possibilities, and they were exposed to these obligations to indemnify when they executed the release. They contracted with these possibilities in mind..... Only the Knutsons and the Chastains will be affected by the fact that this agreement may fail to protect the Chastains from all future liability .... Ironically, the only party that is troubled by the incompleteness, or wisdom, of this release is Morton Foods. Morton Foods, however, neither participated in the negotiation of this instrument, nor paid any consideration for its release from liability.

> Morton Foods, who was not a party to the settlement agreement, is the only one who does not want to give it the force expressed in the document, but it is no more prejudiced by the settlement than if none had been made. Morton Foods has actually been benefitted since the partial settlement made by the Chastains to the plaintiffs reduces Morton Foods' liability. We see no reason why we should be concerned with the potential problems that the Knutsons and Chastains may encounter as a result of this settlement than they were at the time they executed the release.

603 S.W.2d at 807–08 (citation omitted). The Texas court went on to hold that "[t]he fact that an employee has been released in a settlement has no bearing on the continued liability of the employer unless the settle-

ment is in full satisfaction of the plaintiff's claims against both the employer and the employee." *Id.* at 807. This Court is persuaded that *Knutson* states the better reasoned approach to this issue.

■ This raises the very real possibility, however, that the primarily liable agent will remain liable for the full amount of damages notwithstanding the fact that he or she has settled with the plaintiff. But, "[a]s to any subsequent action by the [principal] against the [agent], '[a] primary wrongdoer enters [settlement] agreements at the peril of being later held to respond again in an indemnification action brought against him by the vicarious wrongdoer.'" *Van Cleave v. Gamboni Constr. Co.*, 101 Nev. 524, 529, 706 P.2d 845, 848 (1985) (citation omitted). This potentially undesirable consequence can, of course, be avoided by providing in the settlement agreement that the plaintiff will indemnify the settling defendant for any amount that such party may be called upon to pay in excess of the settlement amount.[11] In such case the plaintiff would have little, if any, incentive to continue pursing a judgment against the derivatively responsible principal, thus effectively bringing the action to a conclusion.

Even where there is no agreement by the plaintiff to indemnify the settling agent, there undoubtedly will be instances where

> the master may elect not to seek indemnification. This is especially true in cases ... where the servant's settlement was for the entire amount of his insurance coverage. Given that the master may choose not to seek indemnity from his servant, who in many cases may be judgment proof, the servant's settlement with the injured party fulfills the underlying policy of [promoting settlement].

*Yates v. New South Pizza, Ltd.*, 330 N.C. 790, 795, 412 S.E.2d 666, 670 (1992). *See also Saranillio v. Silva*, 78 Hawai'i 1, 14, 889 P.2d 685, 698 (1995) (observing in the context of statutory provision permitting settlement between plaintiff and employee to the exclu-

sion of vicariously liable defendant, that "the employee might be spared from indemnifying his/her employer if the employer chooses not to seek reimbursement").

■ Indeed, given the existence of West Virginia Rule of Civil Procedure 14(a), the only way that a settlement between a plaintiff and a primarily liable agent could have any practical consequence in the prosecution of an action would be if the derivatively responsible principal chose not to pursue indemnity by way of a third-party claim. "The purpose of Rule 14(a), ... permitting impleader of a third party defendant by the original defendant, is to eliminate circuity of actions when the rights of all three parties center upon a common factual situation." Syl. pt. 1, *Bluefield Sash & Door Co., Inc. v. Corte Constr. Co.*, 158 W.Va. 802, 216 S.E.2d 216 (1975), *overruled on other grounds, Haynes v. City of Nitro*, 161 W.Va. 230, 240 S.E.2d 544 (1977). Had it chosen to, the Hospital could have filed a third party complaint against the defendant physician on the basis of implied indemnity, in which case the action would proceed, at least from the Hospital's prospective, almost as if there had been no settlement.

■ As this Court has consistently made clear in the past, " '[t]he law favors and encourages the resolution of controversies by contracts of compromise and settlement rather than by litigation[.]' " Syl. pt. 6, in part, *DeVane v. Kennedy*, 205 W.Va. 519, 519 S.E.2d 622 (1999) (quoting syl. pt. 1, *Sanders v. Roselawn Mem'l Gardens, Inc.*, 152 W.Va. 91, 159 S.E.2d 784 (1968)); *see also Board of Educ. of McDowell County v. Zando, Martin & Milstead, Inc.*, 182 W.Va. 597, 604, 390 S.E.2d 796, 803 (1990); *State ex rel. Vapor Corp. v. Narick*, 173 W.Va. 770, 320 S.E.2d 345 (1984); *Floyd v. Watson*, 163 W.Va. 65, 254 S.E.2d 687 (1979); *Janney v. Virginian Ry. Co.*, 119 W.Va. 249, 193 S.E. 187 (1937). In our estimation, permitting plaintiffs to enter into partial settlements with primarily liable parties without requiring them to nec-

---

**11.** It is arguable that such a provision is part of the settlement agreement at issue in this case. Plaintiffs have agreed "to indemnify and hold harmless the [settling physician] of and from any and all claims, demands, actions or causes of action that may hereafter be asserted against [such party] as a result of or any way connected

with the treatment or hospitalizations of Timothy T. Woodrum." Given the fact that this case arises on certified question, we are not called upon to interpret this provision of the settlement agreement, and therefore express no opinion as to its consequence.

essarily forsake their right to pursue further action against parties whose liability is vicarious or derivative, encourages settlement in those instances where countervailing claims for indemnity are unlikely, thus permitting a negligent agent or employee who is without substantial financial resources to buy his or her peace. In virtually every other conceivable circumstance, the converse rule would be just as likely to obstruct settlement as it would be to promote it. This is particularly true because "at least some injured parties 'would be reluctant to settle with the servant or agent, and thereby extinguish his [or her] cause of action against the master or principal, unless he [or she] could settle with the servant or agent for' for full satisfaction (in which case the effect of the common law rule would be irrelevant)." *Saranillio v. Silva*, 78 Hawai'i at 13, 889 P.2d at 697 (quoting *Van Cleave*, 101 Nev. at 530, 706 P.2d at 849) (alterations in *Saranillio*); *see also Pelo v. Franklin College of Indiana*, 715 N.E.2d at 366 (stating that under common-law rule "a knowledgeable plaintiff simply cannot afford to settle piecemeal even if . . . one potential defendant is willing to contribute the full amount of his or her available resources— typically policy limits").

■ Such a preclusive rule would also result in the creation of a perilous danger to the unwary plaintiff, a circumstance that most citizens would find both mystifying and untenable. *Cf. Thornton*, 158 W.Va. at 514, 213 S.E.2d at 108 (abrogating rule that release of original tortfeasor necessarily releases successive tortfeasors, observing that such rule "may, in fact, prove to be a trap for the unwary layman who is ignorant of the law"). We agree with the Indiana Supreme Court that the rule advocated by the Hospital in this case, which would ignore the express intention of the parties to the settlement,

> sets a trap for those litigants who are unaware of the exception for cases based on derivative liability, notwithstanding the general rule . . . that a release will operate as the parties intended. The law is not a game where the litigant with the lawyer who happens to know all the traps wins. To the extent possible rules of law should produce results consistent with the expectations of ordinary citizens. Surely most people, like the [plaintiffs], would be sur-

prised to discover that the [plaintiffs'] release did not mean what it said when it purported to preserve their claim against [the derivatively liable defendant]. Accordingly, when parties sign an agreement releasing one defendant with the clearly expressed expectation that they will be able to proceed against others, that expectation should be given effect by the courts

*Pelo*, 715 N.E.2d at 366.

From a practical standpoint, moreover, it may not always be possible for a settling plaintiff to determine at the time of partial settlement whether his or her claims against other non-settling defendants rest upon actionable conduct on the part of such defendants, or vicarious liability. It is easily conceivable that a plaintiff could release a primarily liable defendant at an early stage of the litigation without obtaining full satisfaction for the underlying claim, on the assumption that the remaining defendants are directly liable, only to find out at a later point that the viability of his or her action against the non-settling defendants rests entirely upon theories of vicarious liability. The rule advocated by the Hospital would deny relief to the plaintiff under such easily foreseeable circumstances.

■ In short, while we are cognizant of the fact that there are differing viewpoints on this subject, we think that a rule permitting a plaintiff to settle with and release a primarily liable defendant without prejudice to the plaintiff's right to further pursue a judgment against defendants who are vicariously responsible is more consistent with our past precedent and holds greater promise for promoting fair and expeditious settlement among litigants. Consequently, we hold that a plaintiff's voluntary settlement with and release of a defendant who is primarily liable for the plaintiff's injury does not operate to release parties defendant whose liability is vicarious or derivative based solely upon their relationship with the settling defendant.

## IV.

## CONCLUSION

For the reasons stated, we answer the question of law certified by the Circuit Court of Monongalia County in the negative.

Certified question answered.

Justice STARCHER, deeming himself disqualified, did not participate in the decision in this case.

Judge BOOKER STEPHENS, sitting by temporary assignment.

ALBRIGHT, Justice, dissenting.

I respectfully dissent from the majority opinion and would answer the certified question in the affirmative. The issue of whether a release or covenant not to sue an agent is tantamount to the release of the principal is an issue of first impression in West Virginia.

## I. West Virginia Guidance

West Virginia Code § 55–7–12 (1931) (Repl.Vol.2000)[1] provides direction regarding releases of tortfeasors, as follows:

A release to, or an accord and satisfaction with, one or more joint trespassers, or tort-feasors, shall not inure to the benefit of another such trespasser, or tort-feasor, and shall be no bar to an action or suit against such other joint trespasser, or tort-feasor, for the same cause of action to which the release or accord and satisfaction relates.

1. Although the sectional heading for West Virginia Code § 55–7–12 is "Liability of one joint tortfeasor not affected by release to, or accord and satisfaction with, another," West Virginia Code § 2–2–10(z) (1998) (Repl.Vol.1999) clearly provides as follows:

The sectional headings or headlines of the several sections of this code printed in blackfaced type are intended as mere catchwords to indicate the contents of the section and shall not be deemed or taken to be titles of such sections, or as any part of the statute, and, unless expressly so provided, they shall not be so deemed when any of such sections, including the headlines, are amended or reenacted[.] Thus, the fact that the heading uses the term "joint-tortfeasor" is of no significance.

2. The Revisers' Note described above is part of the comprehensive revision of West Virginia law incorporated in the Official Code of West Virginia of 1931, which was prepared by the "Commission to Revise and Codify the Statute Laws of the State of West Virginia" and adopted by the Legislature April 3, 1930, effective January 1, 1931.

3. In *Leisure,* this Court explained that although the statute was not specifically applicable to joint tortfeasors, satisfaction and release of one tortfeasor does not impose a bar to an action by the

Prior to the 1931 amendment, that statute did not contain the term "tort-feasor." The statute provided only as follows:

A release to, or an accord and satisfaction with one joint trespasser, hereafter executed or had, shall not inure to the benefit of another such trespasser, and shall be no bar to an action or suit against such other joint trespasser for the same cause of action to which the release or accord and satisfaction relates.

W.Va.Code Ann., c. 136 § 7 (Barnes' Code 1923).

The 1931 addition of the term "tortfeasor" was explained in the Revisers' Note[2] as follows: "The words 'or tort feasor,' wherever occurring, are new, and are added to indicate that this section applies to all joint *wrongdoers,* as is held in *Leisure v. Monongahela Valley Traction Co.,* 85 W.Va. 346, [101 S.E. 737 (1920) ]." (emphasis supplied.).[3] Thus, while the statute[4] clarifies that a release of one tortfeasor does not release another tortfeasor, the issue of whether the release of the tortfeasor functions as a release of a non-wrongdoer such as a vicariously liable employer is not resolved thereby. The statute applies strictly and exclusively to joint wrongdoers, as elucidated in the Revisers' Note.[5] Vicarious liability is a doctrine im-

injured party against a joint tortfeasor with whom no settlement has been made. 85 W.Va. at 349, 101 S.E. at 738.

4. Supporting case law also supports the proposition that a release of one joint tortfeasor does not release other joint tortfeasors. Syl. Pt. 1, *Hardin v. New York Cent. R. Co.,* 145 W.Va. 676, 116 S.E.2d 697 (1960).

5. Interestingly, Rhode Island and New Jersey have included a definition of "joint tortfeasor" in their statutory schemes which resolves the question conclusively for those jurisdictions. The Rhode Island statute, codified at Rhode Island General Laws § 10–6–2 (1970) (Repl.Vol.1997), provides that for purposes of the statute governing the effect of a release upon a joint tortfeasor, " 'joint tortfeasors' means two (2) or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them; provided, however, that a master and servant or principal and agent shall be considered a single tortfeasor." New Jersey's statute similarly states: "A master and servant or principal and agent shall be considered a single tortfeasor." N.J. Stat. Ann. § 2A:53A–1 (West 2000).

posed as a matter of public policy, allowing inclusion of a non-wrongdoer as a party. Vicarious liability is not premised upon the commission of a tort, and there is no *joint wrongdoing* of the employer/principal and employee/agent.[6] Where a principal is liable only through vicarious liability, such principal did not commit a negligent act and would consequently not constitute a "tortfeasor" under West Virginia Code § 55–7–12. Consequently, that statute does not provide a foundation for a conclusion that release of an agent cannot function as a release of the principal.

6. This distinction between joint tortfeasors and an entity liable only vicariously is apparent throughout tort law. In the formula for the determination of whether tortfeasors are to be considered concurrent or successive, for instance, this Court explained in *Sansom v. Physicians Associates, Inc.*, 182 W.Va. 113, 386 S.E.2d 480 (1989), that the test is simply whether "[t]he negligent acts of each of the defendants … 'in point of time and place concur.'" *Id.* at 115, 386 S.E.2d at 482 (*quoting* Syl. Pt. 2, in part, *Lewis v. Mosorjak*, 143 W.Va. 648, 104 S.E.2d 294 (1958)). Thus, a vicariously liable entity cannot be deemed either concurrent or successive in this context since no negligent act was committed by that entity. As explained in the concurring opinion in *Dessauer v. Memorial General Hospital*, 96 N.M. 92, 628 P.2d 337 (App. 1981),

> Vicarious liability is based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of policy that one person should be liable for the act of the other. Its true basis is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another.

*Id.* at 353 (Sutin, J., concurring) (*citing Nadeau v. Melin*, 260 Minn. 369, 110 N.W.2d 29, 34 (1961)).

7. In *Bumgarner*, the Court meandered toward the issue of respondeat superior in a somewhat convoluted and unique manner. Mr. Wallace Bumgarner had brought an action in mandamus against the State Auditor "for the purpose of commanding the auditor to honor the requisition of the State Board of Control for two thousand dollars, the amount awarded to petitioner by the State Court of Claims…." 139 W.Va. at 95, 79 S.E.2d at 281. Mr. Bumgarner had been shot in the thigh by state prison guard I.M. Coiner while Mr. Coiner was searching for an escaped prisoner in Roane County, West Virginia. *Id.* at 96, 79 S.E.2d at 282. The case had proceeded to trial, and Mr. Bumgarner had obtained a judgment against Mr. Coiner in the amount of $3,000.00.

West Virginia case law similarly fails to provide a definitive answer to the certified question posed. We tangentially addressed issues of the doctrine of respondeat superior in conjunction with a determination of the moral obligation of the State in *State ex rel. Bumgarner v. Sims*, 139 W.Va. 92, 79 S.E.2d 277 (1953),[7] and acknowledged that a joint action may be maintained against a master and servant in a case in which the plaintiff's injuries were occasioned solely by the negligence of the servant.[8] *Id.* at 111, 79 S.E.2d at 289. We explained as follows:

> Subject to the rule set forth in points 3 and 4 of the syllabus of the *Humphrey[ v.*

The judgment remained unsatisfied, and upon adjudication of Mr. Coiner as bankrupt, the Court of Claims awarded Mr. Bumgarner $2,000.00. The Legislature thereafter allegedly "made an appropriation … and authorized payment … as a claim against the State Board of Control to be paid from the general revenue fund." *Id.* at 97, 79 S.E.2d at 282. The Auditor refused to pay the $2,000.00 on the grounds that there is no moral obligation of the State to pay and that the legislative appropriation was unconstitutional. Thus, the Court stated that "[t]he basic question presented by this record is whether the appropriation in the amount of two thousand dollars made by the Legislature in the Budget Act for the 1953–55 biennium contained in Chapter 1, Acts of the Legislature, First Extraordinary Session, 1953, is unconstitutional…." *Id.* at 104, 79 S.E.2d at 286. Thus, in determining the moral obligation of the state, the Court noted that while the "doctrine of *respondeat superior* is not applicable to the State because of the State's immunity from suit …, this Court has tacitly applied the rationale of the doctrine in several cases in which declarations by the Legislature of moral obligations on the part of the State, arising from the negligence of its officers, agents and employees in the exercise of governmental functions, were held to be valid." *Id.* at 109, 79 S.E.2d at 288. Upon reaching the subject of respondeat superior, the Court addressed the question of whether an unsatisfied judgment against the agent, coupled with the agent's bankruptcy, would serve to release Mr. Coiner's employer, "if such employer were a private person and not the State of West Virginia." *Id.* at 111, 79 S.E.2d at 289.

8. In syllabus point one of *O'Dell v. Universal Credit Co.*, 118 W.Va. 678, 191 S.E. 568 (1937), this Court addressed the dismissal of a negligent servant and explained: "In a joint action of tort against master and servant, the plaintiff may dismiss the servant for a reason not going to the merits, without impairing his right to proceed against the master, although the latter is liable only under the doctrine of *respondeat superior.*"

*Virginian Ry. Co.*, 132 W.Va. 250, 54 S.E.2d 204 (1949)] case that where the master's duty is absolute and nondelegable, or where the liability of the master is not predicated solely upon the negligence of the employee impleaded, but upon the negligence of another employee, or that of the master himself, an acquittal by a jury of the servant in an action instituted against the master and servant to establish liability based solely on the servant's negligence will not release the master. The relation of master and servant in those cases, in which the doctrine of *respondeat superior* applies, is joint, and the parties should be regarded as though they were joint tort-feasors. *Wills v. Montfair Gas Coal Co.*, 97 W.Va. 476, 125 S.E. 367. In some respects, however, the relation may be regarded as joint and several.

*Id.* at 111, 79 S.E.2d at 289.[9] Syllabus point eight of *Bumgarner* provided:

Subject to the rule that an acquittal by a jury of the servant in an action instituted against the master and servant to establish liability based solely on the servant's negligence, will release the master, the relation between the master and servant, the latter acting within the scope of his employment, is joint and several in the sense that both master and servant are liable for injuries caused by the negligent wrongdoing of the servant, acting within the scope of his employment, and liability for such injuries may be asserted in an action at law against the master and servant jointly or against each of them in a separate action at law.

Id. at 94, 79 S.E.2d at 280–81. The statements in *Bumgarner* regarding the manner in which the principal/agent relationship may resemble the joint tortfeasor relationship were made only in the "sense that both master and servant are liable for injuries caused by the negligent wrongdoing of the servant" as clearly articulated in syllabus point eight of *Bumgarner*. *Id.* Indeed, they are both liable, as joint tortfeasors would both be liable. 139 W.Va. at 94, 79 S.E.2d at 280–81. However, they are not liable as joint wrongdoers; one is culpable and one is not. Thus, while the principal/agent or master/servant relationship does resemble the joint tortfeasor relationship in limited degree, the parallels are not boundless, and the *Bumgarner* court neither encountered nor resolved the question presently before this Court.

The *Bumgarner* court also stated that the common law rule that a valid release of the servant releases the master from liability was abrogated, in part,[10] by West Virginia Code § 55–7–12. 139 W.Va. at 112, 79 S.E.2d at 290. In reviewing the *Bumgarner* opinion in its entirety, it appears that this statement was pure dictum. There was neither an actual release nor a covenant not to sue[11] executed by the plaintiff in *Bumgarner*. The civil action against the wrongdoer, Mr. Coiner, had proceeded to trial, and a jury verdict had been rendered. It was simply not satisfied due to Mr. Coiner's bankruptcy. Any statements regarding the effect of a release of the wrongdoing agent upon the principal must therefore be considered

---

9. *Wills*, however, noted that actors are considered joint tortfeasors "[i]f the tortious act be jointly done, or severally done though for a similar purpose and at the same time, without concert of action...." 97 W.Va. at 478, 125 S.E. at 367.

10. It must also be acknowledged that a statute in derogation of common law must be strictly construed. This Court explained in *State ex rel. Keller v. Grymes*, 65 W.Va. 451, 64 S.E. 728 (1909), that " '[s]tatutes changing the common law are strictly construed, and it is not further abrogated than the language of the statute clearly and necessarily requires.' " *Id.* at 456, 64 S.E. at 730 (*quoting* Lewis' Sutherland Stat. Const. (2d ed.) § 573); *see also Shifflette v. Lilly* 130 W.Va. 297, 43 S.E.2d 289 (1947); *Poling v. Poling*, 116 W.Va. 187, 179 S.E. 604 (1935).

11. Both a release and a covenant not to sue represent affirmative acts by the entity executing the release or covenant not to sue. The failure to satisfy the judgment due to bankruptcy in *Bumgarner* is not analogous to a release or covenant not to sue. In *Didner v. Keene Corp.*, 188 A.D.2d 15, 593 N.Y.S.2d 238 (1993), the New York court reasoned that a consent judgment did not qualify as a "release" for purposes of application of the release of other tortfeasors statute and that "[t]he interpretation which appellant seeks to accord to General Obligations Law § 15–108 is not only at variance with the language of the statute itself but completely ignores its historical genesis and purpose and impermissibly skews the intent of the statute." 593 N.Y.S.2d at 240. The *Didner* court's suggestion was that the release statute is applicable only where the plaintiff discharges a tortfeasor prior to a verdict and entry of judgment. *Id.*

dicta. Such statements were not necessary to the conclusion reached and were not restricted to the facts before the *Bumgarner* Court. This Court has clearly stated as follows in *In re Assessment of Kanawha Valley Bank*, 144 W.Va. 346, 109 S.E.2d 649 (1959):

> The rule of stare decisis does not apply where the former decisions have misunderstood or misapplied the law or are contrary to reason. *Simpkins v. White*, 43 W.Va. 125, 27 S.E. 361. "... no legal principle is ever settled until it is settled right." *Weston v. Ralston*, 48 W.Va. 170, 36 S.E. 446, 450. "... it is better to be right, than to be consistent with the errors of a hundred years." *Lovings v. Norfolk & W.R. Co.*, 47 W.Va. 582, 35 S.E. 962, 965.

*Id.* at 382, 109 S.E.2d at 669.[12]

This Court has also repeatedly cautioned against establishing precedent based upon dicta. As explained in *Kanawha Valley Bank*, "[o]biter dicta or strong expressions in an opinion, where such language was not necessary to a decision of the case, will not establish a precedent." 144 W.Va. at 382–83, 109 S.E.2d at 669. Regarding the rationales of prior holdings and their inclusion within the doctrine of stare decisis, we distinctly stated as follows in *Banker v. Banker*, 196 W.Va. 535, 474 S.E.2d 465 (1996): "This doctrine concerns the *holdings* of previous cases, not the rationales[.]" *Id.* at 546 n. 13, 474 S.E.2d at 476 n. 13.

> *Stare decisis* is the policy of the court to stand by precedent. It is different from the doctrine of *stare rationibus decidendi*—"to keep to the *rationes decidendi* of past cases." Rather under the doctrine of *stare decisis*, a case is important only for what it decides—for the "what" not for "why" and not for "how."

*Id.*

A judicial precedent attaches to a specific legal consequence to a detailed set of facts in an adjudged case or judicial decision, which is then considered as furnishing the rule for the determination of a subsequent case involving identical or similar material facts and arising in the same court or a lower court in the judicial hierarchy. *Allegheny Gen., Hosp. v. N.L.R.B.*, 608 F.2d 965, 969–70 (3rd Cir.1979) (footnote omitted).

An engaging commentary upon the value of dicta was provided by Justice Neely in his dissent to *Pittsburgh Elevator Co. v. West Virginia Board of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983). Justice Neely surmised that "a dissent to dicta is like the sound of one hand clapping." "[L]aw must be written with care. It is meant to be an exercise of the mind, not a venting of the spleen." *Id.* at 758, 310 S.E.2d at 690 (Neely, J., concurring in part and dissenting in part).

The references in *Bumgarner* to the effect of a plaintiff's release of a wrongdoing agent upon a principal were sheer dicta and were confined to a unique set of facts not present in the case sub judice. In its exuberance to provide the victim with recompense and ensure that the moral obligation of the State was satisfied, the majority was overly generous in its comments on the effect of the statute. It is therefore inaccurate to presume that *Bumgarner* provides the answer to this certified question.

## II. Analysis of Reasoning of Other Jurisdictions

Based upon the absence of any definitive authority in West Virginia on this issue, the reasoning and conclusions of other jurisdictions are particularly instructive. As recently recognized by the South Dakota Supreme Court, a split of authority exists in other jurisdictions addressing similar issues regarding a plaintiff's release or covenant not to sue an agent tortfeasor and the effect of such release upon the principal. *Estate of Williams ex rel. Williams v. Vandeberg*, 620 N.W.2d 187 (S.D.2000). "The majority of jurisdictions have held that a principal/em-

---

12. In *Newman v. Kay*, 57 W.Va. 98, 49 S.E. 926 (1905), this Court reasoned as follows:

> One of the best definitions of the term *obiter dictum* is said to be that given by Folger, J., in *Rohrbach v. Ins. Co.*, 62 N.Y. 47, 58. He said: "*Dicta* are opinions of a judge which do not embody the resolution or determination of the court, and made without argument, or full consideration of the point, are not the professed deliberate determinations of the judge himself. *Obiter dicta* are such opinions uttered by the way, not upon the point or question pending, as if turning aside from the main topic of the case to collateral subjects."

*Id.* at 112, 49 S.E. at 931.

ployer is released from liability when the agent/employee is released via a settlement agreement." *Id.* at 189.[13]

## A. The Statutory Basis

Prior to extensive discussion of the weight of such well-reasoned authority, a significant distinction must be recognized; in those jurisdictions deviating from what *Williams* recognized as the majority posture, application of the Uniform Contribution Among Joint Tortfeasors Act ("UCAJTA") has typically played a predominant and decisive role. West Virginia has not adopted the UCAJTA and has relied upon West Virginia Code § 55–7–12, as discussed above, for resolution of issues regarding the release of tortfeasors.

Where the UCAJTA is implicated, some jurisdictions have applied the language of their unique UCAJTA-based statutes to conclude that a principal is indeed deemed a "joint tortfeasor" with the agent actually engaging in the wrongdoing. In *Saranillio v. Silva*, 78 Hawai'i 1, 889 P.2d 685 (1995), for instance, the precise language of the UCAJTA statute and the statutory definition of joint tortfeasor provided the reviewing court little choice. The statute provided as follows:

A release by the injured person of one joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides; but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

889 P.2d at 693–94. The *Saranillio* court observed that the statute was designed to abrogate the common law rule that a release of one joint tortfeasor acted as a release to other joint tortfeasors and recognized the dilemma of application in matters involving principal and agent relationships. *Id.* at 694. The court reasoned that "[i]t clearly applies to joint tortfeasors as that term traditionally has been used; that is, it applies to 'wrongdoers' who act in concert or concurrently. Traditionally, however, an employer was not considered a joint tortfeasor with his/her employee when the employer's liability was based on *respondeat superior.*" *Id.* The *Saranillio* court struggled with the proper application of the statute, explaining, "On its face, therefore, Section 4 would seem not to apply to vicariously liable parties because they are not ordinarily considered joint tortfeasors." *Id.* Upon application of the 1939 version of the UCAJTA, however, the *Saranillio* court observed that the UCAJTA "does not define joint tortfeasors in the traditional sense." *Id.* The statute provides that for purposes of this statute, the "term 'joint tortfeasors' means two or more persons jointly or severally *liable in tort* for the same injury to person or property, whether or not judgment has been recovered against all or some of them." *Id.* (*quoting* 1939 UCATA § 1, HRS § 663–11 (1985) (emphasis supplied)).

The UCAJTA definition of joint tortfeasor is based upon liability rather than negligence and is "exceedingly broad and goes beyond the traditional meaning of the term." *Holve v. Draper*, 95 Idaho 193, 505 P.2d 1265, 1267 (1973). Thus, where a reviewing court is limited to the definition of joint tortfeasor provided in the act, as in *Saranillio*, many courts have held that the definition encompasses the principal liable only vicariously based upon the following reasoning:

The *basis* of liability is not relevant, nor is the relationship among those liable for the

---

13. *See* Annotation, *Release of One Joint Tortfeasor as Discharging Liability of Others Under Uniform Contribution Among Tortfeasors Act and Other Statutes Expressly Governing Effect of Release*, 6 A.L.R.5th 883 (1992); Annotation, *Release of, or Covenant not to Sue, One Primarily Liable for Tort, but Expressly Reserving Rights Against One Secondarily Liable, as Bar to Recovery Against Latter*, 24 A.L.R.4th 547, 555–560 (1983); Annotation, *Release of (or Covenant not to Sue) Master or Principal as Affecting Liability of Servant or Agent for Tort or Vice Versa*, 92 A.L.R.2d 533 (1963). Some jurisdictions have held that release of the agent does not release the principal.

*See, e.g., Yates v. New South Pizza, Ltd.*, 330 N.C. 790, 412 S.E.2d 666 (1992); *Van Cleave v. Gamboni Constr. Co.*, 101 Nev. 524, 706 P.2d 845 (1985); *Alaska Airlines, Inc. v. Sweat*, 568 P.2d 916 (Alaska 1977). Other courts have determined that the release of the wrongdoer must act as a release of the vicariously liable entity. *See, e.g., Mamalis v. Atlas Van Lines, Inc.*, 522 Pa. 214, 560 A.2d 1380 (1989); *Bristow v. Griffitts Constr. Co.*, 140 Ill.App.3d 191, 94 Ill.Dec. 506, 488 N.E.2d 332 (1986); *Horejsi v. Anderson*, 353 N.W.2d 316 (N.D.1984); *Craven v. Lawson*, 534 S.W.2d 653 (Tenn.1976);

tort. In short, it makes no difference whether the ... [employer's] liability is based on the doctrine of *respondeat superior* or any other legal concept. The point is that both it and the [employee] are (at least) "severally" liable for the same injury to the plaintiff. Therefore, the Uniform Contribution Among Tort-feasors Act applies.

*Blackshear v. Clark*, 391 A.2d 747, 748 (Del. 1978).[14]

Similar reasoning was employed in applying a statute containing the "liable in tort" definition in *Wrenn v. Maria Parham Hospital*, 135 N.C.App. 672, 522 S.E.2d 789 (1999). The statute, codifying the UCAJTA as North Carolina General Statute §§ 1B–1 to 1B6, provided that:

When a release or a covenant not to sue ... is given in good faith to one of two or more persons *liable in tort* for the same injury or the same wrongful death:

(1) It does not discharge any of the other tort-feasors from liability for the injury or wrongful death unless its terms so provide[.]

522 S.E.2d at 793 (*quoting* N.C. Gen.Stat. § 1B–4 (1983) (emphasis supplied)). The *Wrenn* Court observed:

Initially, it did not appear that the Uniform Act made any change in the established law of master and servant since the two were not considered to be joint tort-feasors. However, in *Yates v. New South Pizza, Ltd.*, 330 N.C. 790, 412 S.E.2d 666, *reh'g denied*, 331 N.C. 292, 417 S.E.2d 73 (1992), our Supreme Court held that the term "tort-feasors" as used in the Uniform Act included vicariously liable masters. Thus, the *release* of a servant did not release a vicariously liable master, unless the terms of the release provided for release of the master. In *Yates*, the plaintiff was injured in an accident with a pizza deliveryman who was working for New South Pizza, Ltd., d/b/a Domino's Pizza. The plaintiff settled with the driver for $25,000.00, the amount of his insurance coverage, and executed a *covenant not to sue* the driver or the driver's insurer, but "expressly reserved all rights to proceed against defendant ... employer." *Id.* at 791, 412 S.E.2d at 667. In a divided opinion, our Supreme Court held that "*for purposes of this Act,* a 'tort-feasor' is one who is liable in tort." *Id.* at 794, 412 S.E.2d at 669 (emphasis in original).

*Id.* at 793.

**B. The Weight of Well–Reasoned Authority: A Vicariously Liable Entity is Not a Tortfeasor**

Some jurisdictions, as examined above, have confined their evaluation to the strict language of their UCAJTA-based statutes. In the absence of deliberation of the fundamental tort principles and the differences between a joint tortfeasor and a vicariously liable entity, however, a decision regarding this subject is more a matter of linguistics than logic. Where jurisdictions have thoroughly examined the jurisprudential development of the law of tort, specifically the inclusion of the principal/master/employer as a party to be implicated where the impropriety was committed by the agent and the principal is completely free of wrongdoing, the well-reasoned decisions have released the vicariously liable principal upon the release of the agent.

An excellent illustration of such reasoning is found in *Biddle v. Sartori Memorial Hospital*, 518 N.W.2d 795 (Iowa 1994), wherein an emergency patient was negligently discharged from the hospital by her physician. Her legal representative released the physician from liability after a settlement had been reached with the physician. The hospital was thereafter sued for the physician's negligence on a vicarious liability claim. The Iowa Supreme Court acknowledged the "fundamental distinction between the full recovery permitted under the doctrine of joint and several liability, and the limitations inherent in a claim that rests on the doctrine of vicarious liability." *Id.* at 798. The *Biddle* court emphasized the need to address "head-on this important distinction." *Id.*

The *Biddle* court discussed opinions of other jurisdictions holding that settlement with

---

**14.** *See Alaska Airlines*, 568 P.2d at 930 ("[i]t may be that Alaska Airlines is not technically a 'tortfeasor,' but it is 'one of two or more persons liable in tort for the same injury'"); *Yates*, 412 S.E.2d at 669 ("[c]learly, both the master and the servant are 'persons liable in tort for the same injury,' and 'tortfeasors' as used in this provision refers to those persons liable in tort").

the tortfeasor removes the basis for any additional recovery from the principal upon the same acts of negligence. The *Biddle* court adopted the theory that the agent and the principal should be treated as one, applying the single share theory for liability to permit a "settlement with an agent [to] effectively adjudicate[ ] and satisf[y] the vicarious claim." *Id.* (*citing Glover v. Tacoma Hosp.,* 98 Wash.2d 708, 658 P.2d 1230, 1238 (1983)). An opposite outcome, the *Biddle* court reasoned, would generate multiplicity of civil actions and a circuity of claims. The court noted that the doctor's settlement would not be protected if a cause of action were permitted to go forward against the hospital. 518 N.W.2d at 799. "This is because of the well settled rule that a principal found vicariously liable for the negligent acts of an agent retains a right of full indemnity against the actual tortfeasor.... The potential for enforcement of such a right... would clearly have discouraged rather than encouraged settlement...." *Id.* at 799 (citations omitted).

The *Biddle* court utilized the reasoning of the North Dakota Supreme Court in *Horejsi v. Anderson,* 353 N.W.2d 316 (N.D.1984). *Horejsi* expressed the theory of vicarious liability as follows:

The "percentage of negligence" attributable to the conduct of the servant constitutes the entire "single share" of liability attributable jointly to the master and servant.... Because this percentage of negligence represents the "single share" of liability covered by the common liability of the master and servant, the master is necessarily released from vicarious liability for the released servant's misconduct.

*Id.* at 318.

Utilizing this "single share" theory,[15] the South Dakota Supreme Court in *Williams* clearly and conclusively stated that "the plaintiff cannot recover against the principal once recovery against the agent has been completed." 620 N.W.2d at 190. The

*Williams* court reasoned: "The rationales of preventing circuity of action and encouragement of settlement complement one another. The complementary aspects of both rationales serve another important goal: finality. Public policy favors finality, thus avoiding circuity of action that is merely derivative ...." *Id.* "Our holding today fosters the principle of finality while attempting to limit circuity of action and multiplicity of lawsuits, which in this Court's wisdom, is the fairer result." *Id.* at 191.

Similarly, in *Copeland v. Humana of Kentucky, Inc.,* 769 S.W.2d 67 (Ky.Ct.App.1989), the Kentucky tribunal found that because vicarious liability derives solely from the principal's legal relation to the wrongdoer, settlement, through a covenant not to sue, with the tortfeasor removes the basis for any additional recovery from the principal upon the same acts of negligence. *Id.* at 70.

As far as the vicarious liability issue, we find that other courts have spoken to this issue with persuasive reasoning which we paraphrse and adopt. The covenant not to sue not only operated to discharge the anesthesiologists, Schafer and Nash, P.S.C. (the servants/employees) as the parties primarily responsible, it affected a complete discharge of the hospital (the master/employer) who is only secondarily liable, despite the attempted reservation by the Copelands in the covenant of all their rights against the hospital.

*Id.* The Kentucky court found the the plaintiffs

had but one cause of action which the law gave to compensate them for their daughter's injuries. This cause of action for the allegedly tortious conduct of Schafer and Nash was assertable against the hospital only because Schafer and Nash were allegedly acting in their function as employees or ostensible agents of the hospital....

*Id.* Settlement with the wrongdoers "repaired the wrong." *Id.*

This acquittance inured to the benefit of the hospital, for the discharge of the pri-

---

**15.** The Commissioners' Comment to the Uniform Act illuminates the single share issue, as follows:

[This provision] invokes the rule of equity which requires class liability, including the common liability arising from vicarious relationships, to be treated as a single share. For

instance, the liability of a master and servant for the wrong of the servant should in fairness be treated as a single share.

Unif. Contribution Among Tortfeasors Act § 2, 12 U.L.A. 246 (1975).

mary tortfeasor (Schaefer and Nash) must be held to discharge the secondary tortfeasor (the hospital) also from further responsibility, as the hospital's liability for the tortious act was vicarious in nature and derived solely from its legal relation to the wrongdoer, Schafer and Nash.

*Id.*

A plurality of the Michigan Supreme Court, in an extensive and discerning opinion in *Theophelis v. Lansing General Hospital,* 430 Mich. 473, 424 N.W.2d 478 (1988), held that release of the agent is release of the principal even where a plaintiff indicates an express reservation of the right to sue the principal. In *Theophelis,* representatives of the decedent signed a release absolving the doctor and nurse of liability, expressly reserving the right to sue other entities. The Michigan court evaluated the effect of the following Michigan statute:

"When a release or a covenant not to sue or not to enforce judgment is given in good faith to 1 of 2 or more persons *liable in tort* for the same injury or the same wrongful death:

(a) It does not discharge any of the *other tortfeasors* from liability for the injury or wrongful death unless its terms so provide."

*Id.* at 481, 424 N.W.2d 478 (emphasis supplied in original). The court reasoned that "[t]he principal, having committed no tortious act, is not a 'tortfeasor' as the term is commonly defined." 430 Mich. at 483, 424 N.W.2d 478 (*citing* Black's Law Dictionary (5th ed.) (defining a tortfeasor as "a wrongdoer; one who commits or is guilty of a tort.")). The Michigan court concluded that release of the culpable agent discharges any

liability of the principal. *Id.* at 486, 424 N.W.2d 478. The "single share" theory was adopted, citing the *Horejsi* rationale, as discussed above. The Michigan court elaborated as follows:

Put in another context, if *A, B* and *C* are sued because each is guilty of negligence which resulted in injury to a plaintiff, their pro-rata shares of the common liability are to be determined under the contribution statute without regard to whether *A*'s principal, not a wrongdoer, is also joined as a fourth defendant. As between *A,* an agent, and his principal, there is only one tortfeasor, and they represent only one share of the common liability.

430 Mich. at 491, 424 N.W.2d 478.

In *Andrade v. Johnson,* 345 S.C. 216, 546 S.E.2d 665 (App.2001), the Court of Appeals of South Carolina evaluated the claims of a consumer against a heating contractor and an electric and gas utility company. The consumer had executed a covenant not to sue the contractor, and had specifically reserved the right to proceed against the utility. The issue before the court was whether a covenant not to sue the agent also released the principal, the utility company. The court held that the UCATJA[16] governs only those situations involving joint tortfeasors and does not apply to an employer who is only derivatively liable. The consumer had urged the court to "expand the definition of tortfeasor under the UCATA to include vicariously liable parties." 546 S.E.2d at 669. The court explained that the key inquiry is "whether the liability arises *only* vicariously because of the negligence of another party or whether the parties are true joint tortfeasors, both being independently negligent toward the third party." *Id.* The court concluded that the covenant not to sue[17] terminated both

---

**16.** The *Andrade* court noted that South Carolina Code Annotated § 15–38–50 (Supp.2000), based upon the UCAJTA, provides as follows: "When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death: (1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide...." 546 S.E.2d at 668 n. 1 (*quoting* S.C.Code Ann. § 15–38–50 (Supp.2000)).

**17.** The *Andrade* court also explained that although a covenant not to sue is not a release, it

functioned as a release of the principal nonetheless.

While some of the cases on this subject deal with covenants not to sue and others with releases, this distinction should not be the determining factor in the end result. The most important factor is the type of liability and the relationship *inter se* of the various allegedly liable parties rather than the type of document used to discharge liability. It must be determined whether the liability arises *only* vicariously because of the negligence of another party or whether the parties are true joint

the consumer's claims against the contractor and the utility company's derivative liability.

Were we to find the covenant released ... [the agent] but not ... [the principal], it would necessarily follow that ... [the principal] could seek indemnification from ... [the agent] and recover the entire amount of any verdict against it from him. This would effectively strip the covenant not to sue of any real meaning and result in what the court in *Nelson v. Gillette* described as a "corrosive circle of indemnity." 571 N.W.2d 332, 339 (N.D.1997).

*Id.* at 670. Based upon this reasoning, the South Carolina court concluded that even if it were to expand the definition of tortfeasor as North Carolina did in *Yates*, "we find the UCATA simply is not applicable to cases involving indemnity." *Id.*

In *Anne Arundel Medical Center, Inc. v. Condon,* 102 Md.App. 408, 649 A.2d 1189 (1994), a plaintiff released an allegedly negligent pathologist and attempted to sue the medical center on the theory of vicarious liability. The court held that where liability of the medical center was based exclusively upon the negligent conduct of the purported agent, the center and the pathologist were not joint tortfeasors for purposes of the effect of the release under the UCAJTA.[18] The patient's release of the pathologist was therefore found to function as a release of the medical center as a matter of law. *Id.* at 1191. Recognizing the split in authority regarding whether a principal and an agent are considered joint tortfeasors, the Maryland court was "persuaded that the better reasoned approach is to hold that Maryland's version of the UCATA does not include vicar-

iously liable defendants and, therefore, that an agent and his principal are not joint-tortfeasors under ... [the act]." *Id.* at 1193.

The Maryland court considered the argument that the statute should be applied to all entities jointly or severally liable in tort, "regardless of the modality of liability." *Id.* The court astutely recognized, however, that such holding would require it "to ignore the basic and significant distinctions between vicarious and joint liability." 649 A.2d at 1193. Reviewing those basis distinctions, the court held that "[i]t is because of their independent wrongdoing [in the case of true joint tortfeasors] that ... a plaintiff is permitted to bring an action against one joint tortfeasor after having released another joint tortfeasor from liability." *Id.* "Each tortfeasor faces liability for his or her own wrongdoing." *Id.*

### III. Conclusion

Ultimately, it must be the statutory scheme and the underlying tort principles which are determinative. Where tortfeasor is defined as a wrongdoer, as in West Virginia, most reviewing tribunals have held that release of an agent also releases the principal.[19] Where tortfeasor is defined as an entity liable in tort, many courts have held that the release of an agent does not release the principal. Even where the statutory definition of tortfeasor is an entity liable in tort, however, many discerning courts have applied the theoretical underpinnings of tort law to conclude that release of a wrongdoing agent should foreclose further action against the innocent principal.

West Virginia Code § 55-7-12 is applicable exclusively to tortfeasors, defined as

---

tortfeasors, both being independently negligent toward the third party.

546 S.E.2d at 669. Similarly, in *McCurry v. School District,* 242 Neb. 504, 496 N.W.2d 433 (1993), the Nebraska court noted the typical distinction between a covenant not to sue and a release but concluded that the distinction was meaningless within the principal/agent context because of the vicarious liability of the principal. The *McCurry* court sustained the distinction between settlements involving joint tortfeasors and settlements involving vicarious liability and concluded that "it matters not how the settlement was reached; whether by release or covenant not to sue, settlement with the agent constitutes a settlement with the principal, no matter what the parties may have intended." *Id.* at 444.

**18.** The *Anne Arundel* court noted that Maryland Annotated Code article 50, § 16(a) defines "joint tortfeasors" as " 'two or more persons jointly or severally *liable in tort* for the same injury to person or property, whether or not judgment has been recovered against all or some of them.' " 649 A.2d at 1193 (*quoting* Md. Ann.Code 50-16(a) (emphasis supplied)).

**19.** *See Atkinson v. Wichita Clinic, P.A.,* 243 Kan. 705, 763 P.2d 1085, 1087 (1988) (explaining "[o]n the other hand, if the principal's alleged liability is merely imputed by virtue of the alleged tortious conduct of its agent, the principal is not a 'joint tortfeasor' in terms of being an equally culpable wrongdoer. That the master is *jointly liable* does not make him a *joint tortfeasor* as the latter term is generally understood").

"wrongdoers." A vicariously liable entity is not a wrongdoer; therefore the statute simply does not apply. Abundant case law from other jurisdictions should persuade this Court that the weight of well-reasoned authority maintains that unless the plaintiff can demonstrate independent wrongdoing on the part of the principal, termination of the claim against the agent, through release or covenant not to sue, extinguishes the derivative, vicarious claim against the principal as a matter of law. As the *Anne Arundel* court found, "[t]he release of an agent removes the only basis for imputing liability to the principal." 649 A.2d at 1196. A contrary holding would, as so many courts have observed, undermine the public policy favoring settlements. As the *Anne Arundel* court explained: "It is unlikely that an agent would ever settle with a plaintiff if he still remained liable to indemnify his principal for any further amount the principal might be compelled to pay to the plaintiff." *Id.*[20]

Principles of contribution and indemnity may also be significantly confounded where the majority's approach is applied to a complex litigation. The majority opinion obliterates, or at the very least significantly obscures, the distinction between joint liability and vicarious liability. The practical effect of the majority's conclusion may be to frustrate the principles of contribution, properly a concept applicable to joint wrongdoers,[21] compelling one wrongdoer to contribute to the other wrongdoer based on joint and several liabili-

ty.[22] In syllabus point six of *Board of Education v. Zando, Martin & Milstead, Inc.,* 182 W.Va. 597, 390 S.E.2d 796 (1990), this Court explained that "[a] party in a civil action who has made a good faith settlement with the plaintiff prior to a judicial determination of liability is relieved from any liability for contribution."

Indemnification principles apply between the wrongdoer and an entity only vicariously liable through that wrongdoer, such that the vicariously liable entity could seek reimbursement from the wrongdoer even after the wrongdoer had possibly presumed he had been released from further liability based upon the negligent act. In syllabus point seven of *Hager v. Marshall,* 202 W.Va. 577, 505 S.E.2d 640 (1998), this Court explained as follows: "In non-product liability multiparty civil actions, a good faith settlement between a plaintiff and a defendant will extinguish the right of a non-settling defendant to seek implied indemnity unless such non-settling defendant is without fault." The right of the vicariously liable entity to seek indemnification against the settling party, however, has not been held to be extinguished by the settlement and release, and the potential that a vicariously liable entity will seek indemnification from the settling defendant is precisely the basis for the concerns, addressed above, of the various courts examining the circuity of action issue.

The majority is inviting an interminable procession of multifarious applications of con-

---

**20.** I would also emphasize that an assertion was made in oral argument that this Court could contemplate a separate rule on vicarious liability in medical cases. Adoption of such a rule would have obvious shortcomings and would contribute to expenses and concerns regarding the protection of the rights of the citizens of this state to dependable medical care. Additionally, I would caution that references to the Medical Professional Liability Act, particularly West Virginia Code § 55-7B-9(c) (1986) (Repl.Vol.2000), are not appropriate since the scheme enunciated therein is essentially based upon principles of contribution.

**21.** The distinction between indemnity and contribution was clearly explained in *Rio Grande Gas Co. v. Stahmann Farms, Inc.,* 80 N.M. 432, 457 P.2d 364 (1969), as follows: "[T]he difference between indemnity and contribution in cases between persons liable for an injury to another is that, with indemnity, the right to recover ... enforces a duty on the primary wrongdoer to

respond for all damages; with contribution, an obligation is imposed by law upon one joint tortfeasor to contribute his share to the discharge of the common liability." *Id.* at 368.

**22.** In *Sitzes v. Anchor Motor Freight, Inc.,* 169 W.Va. 698, 289 S.E.2d 679 (1982), this Court explained that "[t]he right of contribution developed because it was thought unfair to have one of several joint tortfeasors pay the entire judgment and not be able to obtain contribution from any of his fellow wrongdoers." *Id.* at 708, 289 S.E.2d at 686; *see* West Virginia Code § 55-7-13 (1923) (Repl.Vol.2001) ("Where a judgment is rendered in an action ex delicto against several persons jointly, and satisfaction of such judgment is made by any one or more of such persons, the others shall be liable to contribution to the same extent as if the judgment were upon an action ex contractu.")

tribution and indemnity principles. It creates a tangled web for which there is no end; even perceived resolution through a settlement or covenant not to sue is not a conclusion. To the extent that the majority, by its pronouncements in this case, seeks to protect and sanctify the agreement between the plaintiff and one party that further action against that party is not desired, the majority fails miserably. Permitting further action against the vicariously liable entity only serves to perpetuate the litigation and increase the prospect that the released entity will be revisited through indemnification.[23] As observed by one commentator:

> On the other hand, allowing the suit against the master or principal after a settlement with the servant or agent would reduce the incentive for the servant or agent to settle since he would still be liable for indemnity to the master or principal. This latter construction would probably discourage settlements more than would the *Craven* construction. If suit were brought against the master or principal, he might be lax in defending the suit, secure in the knowledge that whatever damages are assessed against him can be recovered by way of indemnity from the servant or agent. The possibility of such conduct by the master or principal may well induce the servant or agent in order to protect his own interests to go to trial rather than to settle.

*Recent Developments, Torts—Vicarious Liability—Covenant Not to Sue Servant or Agent as Affecting Liability of Master or Principal,* 44 Tenn.L.Rev. 188, 198 (1976).

Based upon the foregoing, I respectfully dissent.

I am authorized to state that Justice MAYNARD joins in this dissent.

**23.** In *Anne Arundel,* the Maryland court explained as follows:

> If a plaintiff, under such a hypothetical legal scheme, were able to find an agent willing to settle, to allow the plaintiff then to proceed additionally against a vicariously liable principal would, in essence, permit the plaintiff "two bites out of the apple." If the principal could then seek indemnity from the agent, the agent's earlier settlement would be of little solace to him. Such a double exposure would act as a disincentive for agents ever to agree to a settlement.
> 649 A.2d at 1196.